J-A31020-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JOHN A. CANCELLERI AND ROSETTA CANCELLERI, HIS WIFE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| FORD MOTOR COMPANY | |
| Appellant | No. 267 MDA 2015 |

Appeal from the Judgment Entered January 20, 2015
In the Court of Common Pleas of Lackawanna County
Civil Division at No(s): 11-CV-6060

BEFORE:  PANELLA, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:          **FILED JANUARY 07, 2016**

Ford Motor Company appeals from the judgment entered in favor of John A. Cancelleri and Rosetta Cancelleri in the Court of Common Pleas of Lackawanna County following a strict products liability trial stemming from a motor vehicle accident.  After careful review, we affirm based upon the opinion of the Honorable James A. Gibbons dated March 2, 2015, which incorporated Judge Gibbons' opinion dated January 9, 2015.

On August 20, 2010, John Cancelleri was driving south on Pennsylvania Route 307 in his 2005 Mercury Sable.  A 2007 Ford Mustang, traveling in the opposite direction, turned left into Cancelleri's path.  The Mustang collided with Cancelleri's Sable at an angle in the left front of the

_____

[*] Retired Senior Judge assigned to the Superior Court.

vehicle. Cancelleri was wearing his seatbelt, but his airbag did not deploy. During the collision, Cancelleri's body moved forward and he hit his head against the windshield. After Cancelleri received emergency treatment at the scene of the accident, he was hospitalized at Community Medical Center in Scranton where he was treated for a four-inch laceration on his scalp. The next day, Cancelleri indicated that he was having difficulty feeling his legs, and an MRI showed that he had suffered a C7-T1 disc herniation and spinal cord compression. Spinal fusion surgery was performed immediately. Since the accident, Cancelleri has been confined to a wheelchair, in addition to suffering other medical problems, such as bladder problems, urinary tract infections, and the onset of diabetes.

Based upon the injuries stemming from the accident, Cancelleri initiated the instant lawsuit against Ford Motor Company, the manufacturer of the Mercury Sable, and Ray Price Motors, the seller of the car, for negligence, strict liability, breach of implied warranty of fitness and/or merchantability, and punitive damages. His wife, Rosetta Cancelleri, also brought a claim for loss of consortium in the suit.

Trial in this matter began on August 11, 2014. Prior to trial, the Cancelleris had limited their claims to strict liability under crashworthiness design defect and malfunction theories, breach of implied warranty, and loss of consortium. In addition, the Cancelleris withdrew all claims as to Ray Price Motors on the final day of the eight-day trial. The jury unanimously found in favor of the Cancelleris on the claims of crashworthiness design

defect and loss of consortium,[1] and the verdict included an award of $5,940,706.86.

Ford filed a timely post-trial motion on September 2, 2014, and oral argument on the motion was held on November 14, 2014. Thereafter, on November 19, 2014, our Supreme Court rendered its decision in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014).[2] Ford filed a post-argument notice of supplemental authority regarding *Tincher*. The trial court issued

---

[1] The jury did not find that Ford had breached any implied warranty and ultimately was not required to decide any questions regarding the Cancelleris' malfunction claim.

[2] In *Tincher*, our Supreme Court addressed the standard of proof required to determine whether a product is in a defective condition in strict product liability cases. A plaintiff may pursue a strict liability claim asserting that a product is defective under a "consumer expectations" theory, a "risk-utility" theory, or both. Prior to *Tincher*, based upon the Pennsylvania Supreme Court opinion in *Azzarello v. Black Bros. Co.*, 391 A.2d 1020 (Pa. 1978), "the balancing of risks and utilities, when implicated, was an issue of law dependent upon social policy to be decided by the trial court." *Tincher*, *supra* at 406. *Tincher* overruled *Azzarello* in this regard to hold that

> when a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product. The credibility of witnesses and testimony offered, the weight of evidence relevant to the risk-utility calculus, and whether a party has met the burden to prove the elements of the strict liability cause of action are issues for the finder of fact.

*Id.* at 407. However, the *Tincher* Court declined to adopt the Restatement (Third) of Torts, such that Pennsylvania remains a Second Restatement jurisdiction. *See id.* at 410.

an opinion and order denying Ford's post-trial motion on January 9, 2015, and entered judgment against Ford on January 20, 2015. This timely appeal followed.

On appeal, Ford raises the following issues for our review, which have been renumbered for ease of disposition:

1. Whether the Supreme Court's decision in **Tincher** requires a new trial because the trial court should have submitted the question of whether Plaintiffs' vehicle was unreasonably dangerous to the jury, and because Ford should have been permitted to introduce evidence of applicable government and industry standards.

2. Whether the trial court erred in excluding Insurance Institute for Highway Safety and National Highway Traffic Safety Administration crash tests, which would have significantly impeached Plaintiffs' defect theory, solely because the tests were conducted by industry and government organizations.

3. Whether the trial court erroneously instructed the jury on a malfunction theory that Plaintiffs had withdrawn, that was irrelevant to Mr. Cancelleri's injuries, and that misstated the law regarding malfunction.

Brief for Appellant, at 4-5.

The determination of whether to grant a new trial involves a two-step process:

First, the trial court must decide whether one or more mistakes occurred at trial. These mistakes might involve factual, legal, or discretionary matters. Second, if the trial court concludes that a mistake (or mistakes) occurred, it must determine whether the mistake was a sufficient basis for granting a new trial. The harmless error doctrine underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake.

- 4 -

*Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000) (citations omitted).

We examine jury instructions

to determine whether the trial court abused its discretion or offered an inaccurate statement of law controlling the outcome of the case. A jury charge is adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error. This Court will afford a new trial if an erroneous jury instruction amounted to a fundamental error or the record is insufficient to determine whether the error affected the verdict.

*Tincher v. Omega Flex, Inc.*, 104 A.3d at 351.

A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal.

*Amato v. Bell & Gossett*, 116 A.3d 607, 621 (Pa. Super. 2015).

Ford's first contention on appeal is that *Tincher* requires the grant of a new trial because the jury was not asked to consider whether Mr. Cancelleri's Mercury Sable was "unreasonably dangerous." More specifically, Ford argues that the jury should have been asked to consider risk-utility factors in making this determination.

Ford correctly argues that consideration of whether a product is defective or unreasonably dangerous was a question of law under *Azzarello* and that *Tincher* has returned that determination to the finder of fact in

strict product liability cases. However, Ford's argument that a new trial is necessary based upon **Tincher** is unpersuasive because **Tincher** did not involve a crashworthiness case, nor did it mandate specific jury instructions to be used in any type of strict liability matter. **See Tincher**, **supra** at 408 (decision "not intended as a rigid formula to be offered to the jury in all situations.")

We note that in crashworthiness cases, the jury is required to determine whether the vehicle was defective in design as well as whether an alternative, safer, and practicable design existed at the time of design that could have been used instead. **Gaudio v. Ford Motor Co.**, 926 A.2d 524, 532 (Pa. Super. 2009). Thus, the jury's considerations in crashworthiness cases, including the instant matter, already involve "proof of risks and utilities" regarding whether "the harm suffered was due to the defective condition of the product." **Tincher**, **supra** at 407. Additionally, we agree with the trial court's determination that the jury instructions in this matter were neither erroneous nor prejudicial toward Ford, and we affirm on the basis of Judge Gibbons' thorough opinion.

The fact that the instant matter is a crashworthiness case also bears on Ford's contention that a new trial must be granted because the trial court precluded Ford from introducing evidence of applicable government and industry standards. Our Supreme Court specifically has "held that 'such evidence should be excluded because it tends to mislead the jury's attention from their proper inquiry,' namely 'the quality or design of the product in

question.'" *Gaudio*, *supra* at 543 (quoting *Lewis v. Coffing Hoist Division, Duff-Norton Company, Inc.*, 528 A.2d 590, 594 (Pa. 1987)). *Tincher* does not, nor does it purport to, affect the applicability of the rulings in *Gaudio* and *Lewis*. Based upon precedent that remains unchanged, the trial court determined that the proposed evidence was inadmissible. We agree and rely upon the trial court's detailed opinion.

Ford next argues that the trial court erred by precluding Ford from introducing evidence of crash tests conducted by government and industry organizations. Ford contends that the crash tests are relevant to impeach the Cancelleris' expert witness, Christopher Caruso. However, as the trial court notes, "Caruso could not be impeached with evidence of industry standards previously precluded by this [c]ourt or on tests that were not elicited on direct examination." Trial Court Opinion, 1/9/15, at 56. We discern no error in precluding evidence of the crash tests in question and affirm based upon the thorough analysis of the trial court.

Finally, Ford asserts that the trial court erroneously instructed the trial court on a theory of malfunction. We note that a plaintiff is permitted to proceed simultaneously on design defect and malfunction theories in a crashworthiness case. *See Raskin v. Ford Motor Co.*, 837 A.2d 518 (Pa. Super. 2003). As to the trial court's decision to instruct on the theory of malfunction and on the precise instruction provided, Judge Gibbons' opinion comprehensively discusses the reasons the instructions were not given in

error and did not result in prejudice toward Ford. We rely upon Judge Gibbons' opinion in finding this claim to be without merit.

We affirm the judgment entered based upon Judge Gibbons' opinions filed March 2, 2015 and January 9, 2015, and we direct the parties to attach a copy of the trial court's opinions in the event of further proceedings.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/7/2016

| | | |
|---|---|---|
| JOHN A. CANCELLERI and | : | In the Court of Common Pleas |
| ROSETTA CANCELLERI, His Wife, | : | of Lackawanna County |
| | : | |
| Plaintiffs | : | |
| | : | |
| | : | |
| v. | : | Civil Division |
| | : | |
| FORD MOTOR COMPANY and | : | |
| RAY PRICE MOTORS, INC., | : | |
| | : | |
| Defendants | : | No. 2011-CIV-6060 |

## MEMORANDUM AND ORDER
## DENYING DEFENDANT FORD'S POST-TRIAL MOTION

GIBBONS, J.

## I. Introduction

This post-trial motion arises from a strict products liability case that ended with a unanimous jury verdict in favor of Plaintiffs John Cancelleri (hereinafter "Cancelleri") and Rosetta Cancelleri, his wife, and against Defendant Ford Motor Company (hereinafter "Ford") in the amount of $5,940,706.86.[1] After approximately eight days of trial and approximately two hours and thirty minutes of deliberations, the jury found that: (1) the airbag/restraint system in Cancelleri's 2005 Mercury Sable was defectively designed in that the car's driver's side airbag failed to deploy when Cancelleri, while driving approximately forty-five miles per hour, was hit at an offset front angle; and (2) this defect factually caused Cancelleri's C7-T1 disc herniation, spinal cord compression, and lower extremity paralysis.

Ford now argues that it is entitled to a judgment notwithstanding the verdict (hereinafter "JNOV") because there was not enough evidence to sustain Cancelleri's crashworthiness and malfunction claims and, consequently, not enough evidence to sustain his wife's loss of consortium

---

[1] The Cancelleris withdrew their claims against Defendant Ray Price Motors, Inc. without objection on the morning of this trial's last day, August 21, 2014. Notes of Testimony (hereinafter "N.T."), 8:9-20, Aug. 21, 2014 (Nardozzi).

claim. Alternatively, Ford argues that it is entitled to a new trial based on a litany of claimed errors, namely our refusal to grant Ford a compulsory nonsuit and directed verdict, erroneous and prejudicial jury instructions, allowing a prejudicial verdict form, our preclusion of surrogate studies performed by Ford experts, our refusal to apply the Restatement (Third) of Torts and admit evidence of industry standards, and our exclusion of industry testing. For the following reasons, Ford's Motion is denied.

## II. Factual Background and Procedural History

Up until the afternoon of August 20, 2010, John Cancelleri was an active eighty-three-year old. An Army Veteran of the Korean War, he testified that he often walked "[a]pproximately two miles" around his neighborhood in the morning, and he sometimes walked additionally around Lake Scranton in the afternoon. Video Dep. Tr. of John Cancelleri (hereinafter "D.T."), 63:6-13; 13-14:20-6, 12/07/11. He further testified that he cut grass, operated a snow blower, and gardened regularly without issue up until the day of his accident. *Id.* at 14:7-24; 63-64:18-15. These points of testimony were undisputed and corroborated at length by Cancelleri's wife of 59 years, Rosetta, his neighbor Thomas Miloard, and his grandson Andrew Kaminski. *See generally* Notes of Testimony (hereinafter "N.T."), 47-49:19-7, 08/18/14 (McCool)[2]; 22-32, 08/15/14 (McCool). While Cancelleri also explained that he did all of the grocery shopping because Rosetta had never driven, Rosetta herself explained that "[h]e drove [her] anyplace [she] wanted to go from morning until night, church, shopping, visiting." D.T., 11:13-14; 14-15:25-4; N.T., 48:5-13, 08/18/14 (McCool). On April 25, 2005, the car he chose to drive was a brand new 2005 Mercury Sable purchased from Ray Price Motors and manufactured by Ford. D.T., 33:3-10.

At about 2:35pm on August 20, 2010, Cancelleri was driving alone in his Sable from a farmer's market outside of Scranton to his home in Covington Township. D.T., 7:4-6; 23:1-7; N.T.

---

[2] For the convenience of those reviewing the record, all cited Notes of Testimony are identified not only by page number(s), line number(s), and date, but also by the last name of the on-duty court reporter.

11:9-20, 08/13/14 (McCool). While traveling south in the right lane of Route 307 in Spring Brook Township at "about forty to forty-five miles" per hour, Cancelleri was hit at an offset front angle by a 2007 Ford Mustang traveling north that "turned left and did not yield to [Cancelleri] coming down in the other direction." N.T., 15-16:20-3; 21:15-17; 24-25:17-4, 08/13/14 (McCool); D.T., 27:15-17. This testimony was corroborated by Donald Phillips, P.E., an expert in accident reconstruction, occupant kinematics, and the operation of seatbelt systems, who testified that the Sable "was doing about 46 miles an hour prior to impact" with the Mustang, and that the crash "was an offset left front collision ... [at] about 15 degrees to the left of center," or "basically almost through the left front headlight." N.T., 26:17-18; 22:23-25; 23:6-7, 08/14/14 (Nardozzi). Cancelleri testified that he did not see the Mustang prior to impact and, therefore, could not recall whether he had time to apply his brakes. D.T., 25:18-20; 27:10-14; 28:6-10.

Despite wearing his seatbelt, Cancelleri's airbag did not deploy. *Id.* at 7-8:25-8; 7:21-24; 30:23-25. He testified that when the collision occurred, he "went forward" and "hit [his] head against the windshield." *Id.* at 7:18-24; 26:12-14. At trial, Covington Emergency Services (hereinafter "EMS") Provider Roseann Hoanzl testified consistently with Cancelleri's account, as she described treating Cancelleri just after the accident for a "contusion" and "laceration on the top of his head with uncontrolled bleeding." N.T., 33:8-16; 43:23-25, 08/13/14 (McCool). Biomedical engineer Dr. Jamie R. Williams, PhD, also testified that the "damage to the windshield ... just to the left of the steering wheel," Cancelleri's "path travel" upon impact, and his "general occupant kinematics" are all "consistent with the laceration to the top of his head" because the Sable's other "interior structures," namely the steering wheel, roof, and A-pillar, "could not have caused the laceration ...." N.T., 47-49:13-11, 08/15/14 (Smolskis).

Both Cancelleri and the State Police Officer who investigated the accident, Trooper First Class Edward Boetcher, testified that just after the collision, the Sable was forced off the right side

of the road toward a row of pine trees, where it eventually "came to rest" against one of the trees. N.T., 15-16:20-10, 25:5-18, 27-28:21-8, 08/13/14 (McCool); D.T., 28:12-23. By that point, the Sable's passenger's side airbag had already deployed despite the passenger-seat being empty, and Cancelleri testified that the passenger's side airbag "went off right away" after the collision and not when the Sable went into the trees. D.T., 7:21-24; 30-32:16-4. EMS Provider Hoanzl testified that Cancelleri was alert and conscious during treatment, and that he received a perfect score on the Glasgow Coma Scale, which she stated is "a scale that we use to determine how alert and how with it [patients] are." N.T., 39-20:19-17, 08/13/14 (McCool).

Dr. Michael David Wolk, M.D., testified that, after receiving immediate on-site emergency treatment, Cancelleri was hospitalized at Community Medical Center in Scranton where he was treated for the four-inch laceration to his scalp. N.T., 12-13:12-12, 08/18/14 (Gliem). On the following day, Cancelleri "indicated that he had difficulty feeling ... his legs," and an MRI was taken. *Id.* at 13:13-20. A subsequent MRI taken on August 22, 2014 revealed that Cancelleri suffered a C7-T1 disc herniation and spinal cord compression, and he consequently underwent immediate spinal fusion surgery. *Id.* at 14-18:7-23. Despite the surgery, Dr. Wolk testified that Cancelleri is "not going to recover" and that he currently has "incomplete tetraplegia" as a result of his accident, "which basically means [his condition] affects all four extremities." *Id.* at 56:9-10; 24:5-19. Significantly, Dr. Wolk concluded that Cancelleri's spinal cord injury "came as a result of [his] cervical disc herniation," and that the "cervical disc herniation was ... a result of the motor vehicle accident." *Id.* at 53-54:25-3. Dr. Wolk further testified that, since his accident, Cancelleri has largely been confined to a wheelchair, and that he has suffered from bladder problems and urinary tract infections, a coccyx ulcer, and the onset of diabetes, all of which are attributable to his accident. *Id.* at 33-34:1-2, 30:8-11, 35-36:19-16; 53:18-6; 55-56:8-6.

As a result of his accident and injuries, Cancelleri sued Ford and Ray Price Motors on October 11, 2011 for negligence, strict liability, breach of implied warranty of fitness and/or merchantability, and punitive damages. *See* Pls.' Compl., 10/11/11. His wife Rosetta sued both for loss of consortium. *Id.* By the start of trial on August 11, 2014, the Cancelleris had narrowed their claims to strict liability under the crashworthiness design defect and malfunction theories, breach of implied warranty (also known as "failure to warn" or "duty to warn"), and loss of consortium. On the last day of trial, the Cancelleris withdrew their claims against Ray Price Motors without objection. N.T., 8:9-20, 08/21/14 (Nardozzi). After approximately eight days of trial, and approximately two hours and thirty minutes of deliberations, a jury unanimously found in favor of the Cancelleris on their crashworthiness design defect and loss of consortium claims in the amount of $5,940,706.86. *See* Verdict, 08/21/14. Jury members did not find that Ford had breached any implied warranty, and they were ultimately not asked to decide any questions related to the Cancelleris' malfunction claim. *Id.*

Ford promptly filed this Post-Trial Motion on September 2, 2014 along with its Brief in Support on October 20, 2014. Pursuant to our briefing schedule, the Cancelleris responded with their Brief in Opposition on November 5, 2014, and an oral argument was held on November 14, 2014. Following our Supreme Court's decision in *Tincher v. Omega Flex, Inc.*, --- A.3d ---, No. 17 MAP 2013, 2014 WL 6474923 (Pa. Nov. 19, 2014), Ford filed a Post-Argument Notice of Supplemental Authority on November 24, 2014 to which the Cancelleris responded on December 15, 2014. Not to be outdone, Ford responded with a Reply to the Cancelleris' Response on Christmas Eve. The Cancelleris then filed a Surreply on New Year's Eve.

III. The New Standard for Strict Liability in Tort

We first acknowledge that our Supreme Court has recently held that a plaintiff pursuing a cause upon a theory of strict liability in tort, such as the design defect theory under the

5

crashworthiness doctrine or the malfunction theory, must initially "prove that the product is in a 'defective condition.'" *Tincher*, 2014 WL 6474923, at *1. "The plaintiff may prove defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Id.* The plaintiff is "the master of the claim in the first instance," and therefore, may bring his or her strict liability claim under the first theory, the "consumer expectations" theory, or the second theory, the "risk-utility" theory, or both. *Id.* at *68. The burden of production and persuasion in such a case is by a preponderance of the evidence. *Id.* at *1. Because our Supreme Court has also recently declined to adopt the Restatement (Third) of Torts: Product Liability §§ 1 *et seq.*, the standards set forth under § 402A of the Restatement (Second) of Torts remain applicable to our determinations. *Id.* at *1, *62 ("Pennsylvania remains a Second Restatement jurisdiction ...."). The latter states:

§ 402A Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[3]

---

[3] The term "seller" includes the "manufacturer" of a product. Restatement (Second) of Torts § 402A cmt. f (1965).

6

Restatement (Second) of Torts § 402A (1965). "In order to prevail in such a product liability case, the plaintiff must establish: (1) that the product was defective; (2) that the defect existed when it left the hands of the defendant; and (3) that the defect caused the harm." *Parr v. Ford Motor Co.*, --- A.3d ---, No. 2793 EDA 2012, 2014 WL 7243152 (Pa. Super. Dec. 22, 2014) (citing *Reott v. Asia Trend, Inc.*, 7 A.3d 830 (Pa. Super. 2010), *aff'd*, 55 A.3d 1088 (Pa. 2012)). "A product is defective 'when it is not safe for its intended use.'" *Id.* (quoting *Weiner v. Am. Honda Motor Co., Inc.*, 718 A.2d 305, 308 (Pa. Super. 1998)).

## IV. Standard of Review for Judgment Notwithstanding the Verdict

Ford first claims that it is entitled to judgment as a matter of law on the Cancelleris' design defect, malfunction, and loss of consortium claims, and that it is therefore entitled to a JNOV. *See* Def.'s Motion for Post-Trial Relief (hereinafter "Def.'s Post-Trial Motion"), Part II, 09/02/14. Specifically, Ford contends that: (1) "[t]here was legally insufficient evidence" to sustain the Cancelleris' design defect claim under the crashworthiness doctrine, Def.'s Post-Trial Motion, ¶ 45; (2) the Cancelleris' preservation of the Sable and advancement of a design defect claim renders the malfunction theory inapplicable, *Id.* at ¶ 67; ¶¶ 71-74; (3) even if the malfunction theory were applicable, the Cancelleris "presented insufficient evidence of malfunction and causation to support a malfunction theory jury charge," *Id.* at ¶ 81; and (4) Rosetta Cancelleri's "loss of consortium claim fails as a matter of law" because "there was insufficient evidence to support … Cancelleri's design defect and product malfunction claims," *Id.* at ¶ 82.

"[A] judgment notwithstanding the verdict is appropriate only if the movant is entitled to judgment as a matter of law, i.e., if the evidence presented at trial was such that no two reasonable minds could disagree that the verdict should be in favor of the movant." *Tincher*, 2014 WL 6474923, at *17 (citation omitted); *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. 2013); *Haan v. Wells*, No. 11-CV-6813, 2013 WL 5616926, at *4 (Pa. Com. Pl. Lackawanna

7

Oct. 11, 2013) (citation omitted), *aff'd*, 103 A.3d 60 (Pa. Super. 2014). As such, "[a]n award of judgment notwithstanding the verdict 'is appropriate only if, reading the record in the light most favorable to [the verdict winner], and affording [the verdict winner] the benefit of all reasonable inferences, we would conclude that there is insufficient competent evidence to sustain the verdict.'" *Tincher*, 2014 WL 6474923, at \*17 (quoting *Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*, 898 A.2d 590, 604 (Pa. 2006)); *Haan*, 2013 WL 5616926, at \*4 (When considering a request for a judgment notwithstanding the verdict, "the evidence must be viewed in the light most favorable to the verdict winner, who must be afforded the benefit of every reasonable inference arising from the trial evidence, while all unfavorable testimony and inferences are rejected.") (citing *Empire Trucking Co.*, 71 A.3d at 932).

> **A. The Cancelleris proved the elements necessary to establish their design defect claim under the crashworthiness doctrine by a preponderance of the evidence, and therefore, Ford's request for a JNOV on this claim is denied.**

Ford contends that it is entitled to judgment as a matter of law on the Cancelleris' design defect claim because "[t]here was legally insufficient evidence" produced at trial that (1) "the driver airbag system and restraint system of the 2005 Mercury Sable was defective," (2) Cancelleri's "injuries (let alone his enhanced injuries, as [the Cancelleris were] required to prove) were attributable to the purportedly defective design," and (3) the alternative designs put forth by the Cancelleris' airbag design and restraint system expert, Christopher Caruso, P.E., "would have prevented or reduced [Cancelleri's] injuries, as is a required element of proof for a plaintiff in a crashworthiness case." Def.'s Post-Trial Motion, ¶¶ 45-46. We disagree.

Our Superior Court has written that "[t]he crashworthiness doctrine is a subset of strict products liability law that most typically arises in the context of vehicular accidents." *Gaudio v. Ford Motor Co.*, 926 A.2d 524, 532 (Pa. Super. 2009) (citing *Colville v. Crown Equip. Corp.*, 809 A.2d 916, 922

8

(Pa. Super. 2002), *appeal denied*, 829 A.2d 310 (Pa. 2003)), *appeal denied*, 989 A.2d 917 (Pa. 2010).

Wrote the court,

> First explicitly recognized as a specific subset of product liability law by this Court in *Kupetz v. Deere & Co., Inc.*, 435 Pa.Super. 16, 644 A.2d 1213 (1994), the term "crashworthiness" means "the protection that a motor vehicle affords its passenger against personal injury or death as a result of a motor vehicle accident." *Id.* at 1218. The doctrine extends the liability of manufacturers and sellers to "situations in which the defect did not cause the accident or initial impact, but rather increased the severity of the injury over that which would have occurred absent the design defect." *Id.* To avoid liability, a manufacturer must design and manufacture the product so that it is "reasonably crashworthy," or, stated another way, the manufacturer must include accidents as intended uses of its product and design accordingly. *Id.*

*Gaudio*, 926 A.2d at 532; *accord Parr*, 2014 WL 7243152, at *3. Ultimately, a crashworthiness claim requires proof of three elements: (1) the plaintiff must prove that the design of the vehicle was defective, and that at the time of design an alternative, safer, and practicable design existed that could have been incorporated instead; (2) the plaintiff must identify those injuries he or she would have received if the alternative design had instead been used; and (3) the plaintiff must demonstrate what injuries were attributable to the defective design. *Gaudio*, 926 A.2d at 532 (citing *Kupetz*, 644 A.2d at 1218).

1. **The Cancelleris proved that the design of the 2005 Mercury Sable was defective, and there was an alternative, safer, and practicable design that existed at the time of its design that could have been incorporated instead.**

First, the Cancelleris proved at trial by a preponderance of the evidence that "the design of the vehicle was defective, and that at the time of design an alternative, safer, and practicable design existed that could have been incorporated instead." *Gaudio*, 926 A.2d at 532 (citing *Kupetz*, 644 A.2d at 1218). To do so, the Cancelleris relied on the testimony of Phillips and Caruso.

Phillips testified that the Sable's "seat belt buckle has what is called a pretensioner" that fires and "shortens the buckle's slack" by "about two to two and a half inches" upon command from the air bag control module. N.T., 28:1-16, 08/14/14 (Nardozzi). Based on his inspection of the Sable,

9

Phillips concluded that "the driver's side seat belt buckle pretensioner fired in this crash so that the air bag control module saw an impact and commanded that pretensioner to detonate." N.T., 28:17-21, 08/14/14 (Nardozzi); *see also id.* at 28:1-3 ("[T]he sheath of the buckle is down almost even with the cushion. And you don't know it yet but it looks kind of short."). He explained that a seat belt system "is designed to pay out with the expectation that under certain crash severities there's going to be an airbag there waiting for you," and that this point of exchange between the seat belt and the airbag "is called the hand off." *Id.* at 41-42:20-2.

Phillips also opined that the Delta V, which is the change in velocity upon impact or "how much speed [it would] take to create [the] amount of damage" in a crash, experienced by the Sable was "approximately 20 miles per hour." *Id.* at 25:13-16; 41:5-7. He confirmed the twenty miles-per-hour Delta V with "a download of the [Sable's] air bag control module." *Id.* at 41:9-11. This calculation, he said, helped determine "what forces were imparted to the occupants and what forces they would have seen in the collision." *Id.* at 26:13-15. Ultimately, Phillips concluded that "a 20 mile per hour [Delta V] crash should have been an air bag deployment." *Id.* at 42:10-12.

Thereafter, Caruso testified with regard to a specific design defect related to the Sable's front crash sensor ("FCS") and mounting structure. He first explained that the way in which the FCS is mounted is "essential to whether or not you are going to be able to deploy airbags correctly when needed." N.T., 28:18-22, 08/14/14 (McCool). "It's important for the senor wherever it is located in the vehicle to see that crash pulse as it develops as quickly as possible and as uniformly as possible," he said, and that "a sudden loss of information can have a huge impact on the ability of [the] crash sensor to do its job." *Id.* at 33:17-20; 34: 4-6. For angled crashes and crashes "that [are] offset and [don't] actually hit the sensor itself," Caruso explained that the crash pulse transmission needs to get to the mounting structure and "continue to transmit [the crash] information to the sensor until it makes its decision," i.e., "deploy" or "no deploy." *Id.* at 34-35:25-12; 35-36:25-1. The sensor

10

information is then transmitted to "the primary airbag controller" known as the Restraint Control Module, or "RCM," which "physically turns on the airbags when the appropriate crash sensing information has been received ... and get[s] them to deploy." N.T., 55-56:20-6, 08/14/14 (McCool).

In articulating his design defect theory, Caruso testified that he made "an initial determination that that the crash sensor should have provided enough input to create an airbag deployment for Mr. Cancelleri." *Id.* at 37:5-8. He did so by calling attention to the Sable's upper radiator support, or upper radiator tie bar, and noting that such supports usually go "all the way across the structure" and "hold the radiator and some other components." *Id.* at 38:9-13. "But in this case," he said, the Sable's design was such that the upper radiator support "actually drop[ped] down and cradle[d] the [FCS]." *Id.* at 38:14-20. This is significant because "all of [the] crush, all of the motion of the two vehicles colliding ... [was] going into the structure, going to this [fiberglass] cross member." *Id.* at 38:18-20; 68:19-23. It was this "fiberglass structure that directly transmit[ted] the] crash pulse to [the FCS]." *Id.* He opined that during Cancelleri's collision, the Sable's front "bumper collapsed underneath [the FCS] due to the crush," but that the FCS "barely moved." *Id.* at 37-38:21-6. Specifically, the FCS was still positioned in front of the vehicle, "hanging out in the breeze while [the Sable was] actually crushing and deforming ...." *Id.* at 39:10-14. This occurred because the fiberglass cross member, which cradled the FCS, was "completely severed from the [FCS]," the result of which was an FCS "losing the [crash] information" because "[n]one of it [was] translating to where the FCS [was]." *Id.* at 38:15-22. Caruso theorized that at that point in the accident, the FCS was "no longer in the crush zone" and "no longer receiving the crash," and therefore, the FCS had "no idea how severe this crash [was]." *Id.* at 39:3-9; 15-17.

Additionally, Caruso relied on Ford Crash Test No. 11226 (hereinafter "Test No. 11226") to determine that Cancelleri's airbag should have deployed. In particular, he explained that the collision and resulting damages in Test No. 11226, which was a forty-five miles per hour vehicle-to-vehicle

11

frontal offset crash where "the vehicles only overlap[ped] 25 percent of the front end," are very similar to those in Cancelleri's accident. N.T., 45:18-21; 46-47:21-3, 08/14/14 (McCool); Pls.' Ex. 87B. With this in mind, he explained that "[a]ccording to Ford's requirements, this test must deploy the airbag for the unbelted and belted occupants" "within about 40 milliseconds," and that they in fact did so during the test. N.T., 48:2-4; 49-50:3-7, 08/14/14 (McCool). According to Caruso, the critical differences between Test No. 11226 and Cancelleri's accident related to the fiberglass cross member. In particular, Caruso explained that there was fracturing to the fiberglass cross member in Test No. 11226, but that it "[didn't] appear to have completely separated" because the FCS was obviously still connected. *Id.* at 54:7-12. There, the vehicle's bumper "was pushed in" and the FCS "moved more or less with the position of the bumper." *Id.* at 54:15-18. Here, however, the Sable's "whole bumper [was] twisted and pushed back," but "the structure holding [the FCS was] 3, 4, 5 inches out in front" because it was fractured and separated from the fiberglass cross member. *Id.* at 40:1-12. Caruso therefore concluded, as an expert in design engineering specifically with regard to automotive safety design engineering, that the Sable's airbag/restraint system, "including the vehicle structure[,] was defective and unreasonably dangerous." *Id.* at 13:20-24; 77:13-15.

With regard to technologically and economically feasible alternative designs available to Ford for the 2004-2005 model year, Caruso testified that the upper radiator tie bar could have been "properly designed not to fracture and sever" such that the fiberglass structure could have been imbedded with a thin sheet of aluminum to preserve the structure's integrity and prevent a "crack in every single crash." *Id.* at 73:14-19; 73-74:21-2; 90-91:20-9. On the other hand, if "there was some very good reason to keep the system with [only] the fiberglass," Ford could have "put two sensors up front, one on the left, one on the right directly in the crush zone." *Id.* at 73-74:15-8.[4] He explained that with a two sensor system, "There would be no issue of whether the structure cracks

---

[4] Ford's design analysis engineer, Ram Krishnaswami, PhD, verified that the two-sensor system was available to Ford during the 2004-2005 model year. N.T., 84-85:25-5, 08/20/14 (McCool).

or breaks because the sensor is going to experience the entire crash anyway" because "[i]t's right where the crash is occurring." N.T., 74:9-12, 08/14/14 (McCool). While a single crash sensor costs about $5.00, the additional wiring and assembly would cost about "$7 to $7.50 to add another sensor and make it a dual front crash sensor system." *Id.* at 74-75:20-7. Notably, the Sable's RCM was fully capable of handling more than one front crash sensor. *Id.* at 75:8-11.

Based on the foregoing testimony, the Cancelleris clearly satisfied the first element of *Gaudio*.

### 2. The Cancelleris proved that Cancelleri would not have endured a C7-T1 disc herniation if the alternative designs had instead been used.

Second, the Cancelleris identified at trial those injuries Mr. Cancelleri "would have received if the alternative design had instead been used." *Gaudio*, 926 A.2d at 532 (citing *Kupetz*, 644 A.2d at 1218). On this element, the Cancelleris relied upon the testimony of Dr. Williams, who concluded that based on the "evidence of the injury, the known mechanism of injury of his disc herniation, the physical evidence within the vehicle, and general occupant kinematics and the accident reconstruction," "Cancelleri's [C7-T1] disc herniation was the result of him striking his head on the windshield and that was the result of the failure of his air bag to deploy." N.T., 49-50:19-4, 08/15/14 (Smolskis). She also affirmed that Cancelleri's cervical injury was the product of both neck flexion and a compressive load to the top of his head. *Id.* at 50-51:25-3. On this point, she explained that had an airbag deployed, the flexion in Cancelleri's neck "would have been greatly reduced in that when the seat belt hands off to the air bag, the airbag slows down not only the face but the upper torso." *Id.* at 50:9-12. "[I]f an airbag had been there," she opined, Cancelleri "would not have had a [compressive] load transmitted through the top of his head." *Id.* at 50:22-24.

As aforementioned, Caruso testified that the Sable's upper radiator tie bar could have been "properly designed not to fracture and sever" such that the fiberglass structure could have been imbedded with a thin sheet of aluminum to preserve the structure's integrity and prevent a "crack in every single crash." N.T., 73-74:21-2; 90-91:20-9, 08/14/14 (McCool). Such a design, he concluded,

13

could have given "proper integrity to the single sensor to provide the information that the [FCS] needed to fire Mr. Cancelleri's airbags." N.T., 73-74:25-2, 08/14/14 (McCool). He also stated that if "there was some very good reason to keep the system with [only] the fiberglass," Ford could have "put two sensors up front, one on the left, one on the right directly in the crush zone." *Id.* at 73-74:15-8.[5] He explained that with a two sensor system, "There would be no issue of whether the structure cracks or breaks because the sensor is going to experience the entire crash anyway" because "[i]t's right where the crash is occurring." *Id.* at 74:9-12. Significantly, this point was corroborated by Ford's own expert, Jeffrey Pearson, M.E., who testified that had the dual sensor system been integrated in the Sable's design, "in [Cancelleri's] collision the sensor may be more closely positioned for that accident." N.T., 16:12-15, 08/19/14 (Gliem). He also agreed that one of the sensors of the dual system would be in the crush zone of Cancelleri's crash. *Id.* at 16:9-17.

Based on the foregoing testimony, it is quite evident that the Cancelleris satisfied the second element of *Gaudio*.

### 3. The Cancelleris proved that the injuries were attributable to the defective design of the 2005 Mercury Sable.

Third, the Cancelleris proved at trial by a preponderance of the evidence "what injuries were attributable to the defective design." *Gaudio*, 926 A.2d at 532 (citing *Kupetz*, 644 A.2d at 1218). To do so, they relied on the medical opinions of Dr. Wolk and Dr. Williams.

Dr. Wolk initially concluded that Cancelleri's spinal cord injury and "incomplete tetraplegia" "came as a result of [his] cervical disc herniation," and that the "cervical disc herniation was ... a result of the motor vehicle accident." N.T., 56:9-10; 24:5-19, 08/18/14 (Gliem).

Similarly, Dr. Williams generally concluded that "the injuries Mr. Cancelleri sustained were caused by a strike to the head, ... [and] that he struck his head as a result of the failure of his air bag

---

[5] *See supra* note 4.

to deploy." N.T., 17-18:22-1, 08/15/14 (Smolskis). She made further conclusions upon review of Cancelleri's medical records and inspection of the Sable.

After reviewing Cancelleri's medical records, Dr. Williams explained that on August 22, 2010, an MRI revealed that Cancelleri had "a massive disc herniation at C7-T1, which is the last cervical vertebra and the first thoracic vertebra ...." *Id.* at 15-16:20-14. This massive disc herniation, she said, occurs "where part of the [disc] material is actually shoved out of the space behind the vertebral bones into the spinal cord," which means "that it's been extruded back into the spinal canal," thereby "narrowing the spinal canal" and "push[ing] the spinal cord rearward ...." *Id.* at 16:8-11; 21:1-12. Dr. Williams further explained that a herniation such as this "happens under hyperflexion." *Id.* at 23:13. Flexion, she said, is "the forward bending of one's head," such as "bringing your chin down to your chest." *Id.* at 23:14-16. "When this happens suddenly" and "under extreme conditions," she said, "we can actually have that nucleus material extruded rearward and shoved out the back of the disc," which is consistent with hyperflexion and Cancelleri's injuries. *Id.* at 23-24:17-7; 23:19-25. She clarified that a C7-T1 disc herniation was "consistent with the symptoms that Mr. Cancelleri started complaining of the day before [his August 22, 2010 MRI]," namely his "problems walking, problems feeling his legs," and "problems urinating ...." *Id.* at 22:2-15.

Dr. Williams also opined with regard to the "10-centimeter scalp laceration to the top of [Cancelleri's] head," which ran "front to back as opposed to side to side." *Id.* at 42-43:20-18. When inspecting the Sable, Dr. Williams found "quite a bit of damage to the windshield ..." N.T., 27:13-14, 08/15/14 (Smolskis). Notably, she concluded that the "damage to the windshield ... just to the left of the steering wheel," Cancelleri's "path travel" upon impact, and his "general occupant kinematics" are all "consistent with the laceration to the top of his head" because the Sable's other "interior structures," namely the steering wheel, roof, and A-pillar, "could not have caused the

15

laceration ...." N.T., 47-49:13-11, 08/15/14 (Smolskis). She therefore opined that "the windshield is what caused the 10-centimeter laceration to [Cancelleri's] head." *Id.* at 48:1-4. Dr. Williams also based this opinion "on the accident reconstruction of the collision and Mr. Cancelleri's own testimony that he hit the windshield ...." *Id.* at 49:4-7. Specifically, Cancelleri said that when the collision occurred, he "went forward" and "hit [his] head against the windshield." D.T., 7:18-24; 26:12-14. At trial, EMS Provider Hoanzl testified consistently with Cancelleri's account, as she described treating Cancelleri just after the accident for a "contusion" and "laceration on the top of his head with uncontrolled bleeding." N.T., 33:8-16; 43:23-25, 08/13/14 (McCool). Dr. Williams explained that this testimony combined with the laceration itself and "the contusions to [Cancelleri's] left shoulder and ... bilateral hips" indicating seatbelt use prove that Cancelleri's body would "move forward and to the left ... to the point of contact" during the accident. N.T., 48:49: 23-3, 08/15/14 (Smolskis). This, therefore, "would put him in the trajectory of the top of his head being at that point of contact on the windshield." *Id.* at 49:4-11.

Like Dr. Wolk, Dr. Williams also opined that "Cancelleri's disc herniation was the result of him striking his head on the windshield and that was the result of the failure of his air bag to deploy." *Id.* at 40:19-22. She also affirmed that this particular cervical injury was the product of both hyperflexion and compressive loading, which were initially discovered at Community Medical Center in Scranton on August, 22, 2010. *Id.* at 51:25-3. Based on the foregoing testimony, it is evident that the Cancelleris satisfied the third element of *Gaudio.*

Overall, when viewing the record in a light most favorable to the Cancelleris, the verdict winners, and rejecting all unfavorable testimony and inferences, we find that the Cancelleris readily proved the elements necessary to establish their design defect claim under the crashworthiness doctrine, and therefore, Ford's request for a JNOV on this claim is denied.

16

*B. The Cancelleris proved the elements necessary to establish their malfunction claim by a preponderance of the evidence, and therefore, Ford's request for a JNOV on this claim is denied.*

Ford next contends that we erred by failing to enter judgment in its favor on the Cancelleris' malfunction claim because (1) the "Sable was preserved and [available] [sic] to [the Cancelleris] and their experts at all times," and (2) "[i]n light of [the Cancelleris'] very specific design defect theory, this was simply not a situation in which the malfunction doctrine was applicable." Def.'s Post-Trial Motion, ¶¶ 67, 71. Alternatively, Ford contends that even if the malfunction theory were applicable to this case, the Cancelleris (1) "failed to establish the occurrence of a malfunction," (2) "failed to establish malfunction by eliminating reasonable secondary causes," and (3) "failed to establish the remaining elements of their crashworthiness claim." *Id.* at ¶¶ 75, 73. Again, we disagree.

In explaining the malfunction theory, our Supreme Court has written that,

> [A] plaintiff pursuing a case under the malfunction theory can assert a successful strict product liability claim based purely on circumstantial evidence in cases where the allegedly defective product has been destroyed or is otherwise unavailable. Although the plaintiff does not have to specify the defect in the product, the plaintiff nonetheless must present evidence from which a jury can infer the elements of a strict liability action, beyond mere speculation.
>
> . . .
>
> While reminiscent of the logic of a *res ipsa loquitur* case, the malfunction theory requirements correlate with the three elements of a standard [Restatement (Second) Torts, § 402A] claim. First, the "occurrence of a malfunction" is merely circumstantial evidence that the product had a defect, even though the defect cannot be identified. The second element in the proof of a malfunction theory case, which is evidence eliminating abnormal use or reasonable, secondary causes, also helps to establish the first element of a standard strict liability case, the existence of a defect. By demonstrating the absence of other potential causes for the malfunction, the plaintiff allows the jury to infer the existence of defect from the fact of a malfunction. For example, by presenting a case free of abnormal uses, such as using the product for an unintended purpose, the plaintiff can demonstrate that the product failed to perform as a reasonable customer would expect; thus, that it malfunctioned. Similarly, by eliminating other reasonable secondary causes, a plaintiff allows the jury to infer that a defect in the product caused the malfunction, as opposed, for example, to operator error or failure to service the equipment. Similarly, by presenting a case free of "abnormal uses" by the plaintiff and free of "other reasonable secondary causes," a plaintiff can establish through inference from circumstantial evidence the second and third elements of a 402A case, that the alleged defect caused the

17

injury (as opposed to another cause) and that the defect existed when it left the manufacturer's control (as opposed to developing after the product left the manufacturer's control).

*Barnish v. KWI Bld. Co.*, 980 A.2d 535, 539; 541-42 (Pa. 2009) (citation omitted). To establish a *prima facie* case of strict products liability under the malfunction theory, a plaintiff can adduce circumstantial evidence including: (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident does not occur absent a manufacturing defect. *Blumer v. Ford Motor Co.*, 20 A.3d 1222, 1230 (Pa. Super. 2011) (quoting *Barnish*, 980 A.2d at 542-43), *appeal denied*, 49 A.3d 441 (Pa. 2012). Ultimately, though, a plaintiff proves a malfunction by establishing: (1) the occurrence of a malfunction; (2) evidence eliminating abnormal use; and (3) evidence eliminating reasonable secondary causes. *Blumer*, 20 A.3d at 1229-30 (quoting *Barnish*, 980 A.2d at 541-42).

**1. The Cancelleris' preservation of and access to the 2005 Mercury Sable does not automatically render their malfunction claim inapplicable to this case.**

Ford first contends that the malfunction theory was inapplicable to this case because the "Sable was preserved and [available] [sic] to [the Cancelleris] and their experts at all times," because the Cancelleris' "airbag system expert, in fact, inspected the [Sable] as part of his investigation," and because "the jury viewed the [Sable] itself ..." Def.'s Post-Trial Motion, ¶¶ 67-68 (citations omitted). Ford relies on a string of cases purportedly in support of its argument. The first is *Barnish*, where our Supreme Court wrote that "a plaintiff pursuing a case under the malfunction theory can assert a successful strict product liability claim based purely on circumstantial evidence in cases where the allegedly defective product has been destroyed or is otherwise unavailable." 980 A.2d at 408. Ford misconstrues *Barnish* as being restrictive on plaintiffs when, in fact, it is actually permissive; for it is clear upon a single review of the provision invoked by Ford that *Barnish* simply allows plaintiffs to

18

advance a strict product liability claim and attempt to prove that a product is defective despite not having possession of or access to that product. *Barnish* does not, as Ford implies, bootstrap plaintiffs to the design defect theory and automatically render the malfunction theory inapplicable simply because those plaintiffs have possession of or access to the product in question. It is not, as Ford suggests, an "either/or" proposition.

Additionally, Ford relies on *Raskin v. Ford Motor Co.*, where our Superior Court wrote, "In most instances, the plaintiff will produce direct evidence of the product's defective condition." 837 A.2d 518, 523 (Pa. Super. 2003) (quoting *Rogers v. Johnson & Johnson Prods. Inc.*, 565 A.2d 751, 754 (1989) (citations omitted)). "In some instances, however, the plaintiff may not be able to prove the precise nature of the defect in which case reliance may be had on the 'malfunction' theory of product liability." *Id.* at 523 (quoting *Rogers*, 565 A.2d at 754). Again, Ford misconstrues the law. In *Raskin*, Plaintiff Lee Robin Raskin sued Ford based on an alleged defect in the seat of her 1989 Ford Escort that "caused it to break loose" after she was rear-ended at a red light. *See Raskin v. Horne*, No. 3310, 2002 WL 34078126 (Pa. Com. Pl. Phila. March 21, 2002). Significantly, Raskin advanced a malfunction claim despite the fact that her "father retained ownership of the [allegedly defective] vehicle at the time of [the] action's 1992 commencement and for a significant period thereafter, before selling it to a third party from whom Ford purchased the car in 1997." *Raskin*, 837 A.2d at 521 n.2.[6] From this, we can at least conclude that a plaintiff is not prohibited from advancing a malfunction claim simply because that plaintiff has access to or possession of the allegedly defective

---

[6] We note that the trial court in *Raskin* contemplated the issue of whether Raskin or Ford actually had access to the allegedly defective seat, and ultimately found that both did. The trial court's record reflects that following the accident, the seat "was repaired by [Raskin's] father who continued to drive the car after the accident ...." However, after the first trial in June of 1994, the seat "was stolen from outside the courtroom ...." During the second trial in September of 2000, Ford argued for sanctions against Raskin because the seat's spoliation had supposedly prejudiced Ford. In rejecting this argument, the trial court reasoned that Ford "suffered no prejudice for several reasons: (1) the actual product was not destroyed or missing until sometime after the first trial and Ford was in possession of the vehicle prior to and at the time of the first trial ...." *Raskin*, 2002 WL 34078126.

19

product in question. As such, we find that the Cancelleris' preservation of and access to the Sable does not automatically render their malfunction claim inapplicable to this case.

2. **The Cancelleris' advancement of a design defect claim under the crashworthiness doctrine does not automatically render their malfunction claim inapplicable to this case.**

Ford next contends that the malfunction theory was inapplicable to this case because the Cancelleris advanced a "very specific design defect theory." Def.'s Post-Trial Motion, ¶ 71 (citations omitted). Ford relies on the same string of purportedly supportive cases to make its argument. Relevant to this portion of Ford's contention is *Dansak v. Cameron Coca-Cola Bottling Co.*, where our Superior Court noted, "When a plaintiff seeks to prove that the entire line of products was designed improperly, the plaintiff need not resort to the malfunction theory." 703 A.2d 489, 495 n.8 (Pa. Super. 1997), *appeal denied*, 727 A.2d 131 (Pa. 1998). This reliance, however, is again misplaced, as the *Dansak* footnote cited by Ford is not outright prohibitive. "Need not" does not equate to "cannot" or "must not," and appellate case law since *Dansak* makes this quite clear. Stated simply, a plaintiff is not prohibited from advancing a malfunction claim in a crashworthiness case. *See Raskin*, 837 A.2d 518 (plaintiff averred that the seat of her 1989 Ford Escort malfunctioned when it broke loose after a rear-end collision, thereby prompting the trial court to instruct on both the malfunction and crashworthiness doctrines); *Harsh v. Petroll*, 840 A.2d 404 (Pa. Cmwlth. 2003) (allowing plaintiff to advance both a specific design defect claim under the crashworthiness doctrine and a malfunction claim[7]), *appeal denied in part*, 864 A.2d 531 (Pa. 2004), *aff'd in part*, 887 A.2d 209 (Pa. 2005). Moreover, the law does not force a plaintiff to choose between advancing either a specific design defect claim or a malfunction claim. *See Blumer*, 20 A.3d 1222, 1229 ("At trial, Plaintiff proceeded on various causes of action, including negligence, defective design and failure to warn. Notably, Plaintiff also advanced a strict product liability claim pursuant to a product malfunction theory."); *Harsh*, 840

---

[7] The Commonwealth Court labeled the malfunction claim as a "manufacturing defect claim," but described the theory using the malfunction elements articulated in *Dansak*, 703 A.2d at 496.

A.2d 404. Based on our appellate case law, we find that the Cancelleris' advancement of a design defect claim under the crashworthiness doctrine does not automatically render their malfunction claim inapplicable to this case.

3. **The Cancelleris' simultaneous advancement of a design defect claim under the crashworthiness doctrine and a malfunction claim is not inconsistent with our appellate case law.**

We emphasize that the Cancelleris' advancement of a design defect claim under the crashworthiness doctrine and a malfunction claim is not inconsistent with our Superior Court's dictum in *Raskin*. There, the court wrote that the crashworthiness and malfunction doctrines "are not mutually exclusive, nor are they alternative theories of recovery in a products liability case." *Raskin*, 537 A.2d at 522-23. Considering this assertion in different terms, a plaintiff cannot attempt to prove that a product was defectively designed to the exclusion of that product malfunctioning, nor can that plaintiff attempt to prove that a product malfunctioned to the exclusion of that product being defectively designed. Moreover, a plaintiff cannot use the malfunction theory as an alternative, or back-up, theory of liability in the event that his or her design defect claim fails. However, it follows logically that a plaintiff *can* advance both a design defect claim and a malfunction claim so long as they are not to each other's exclusion and so long as they are not pled in the alternative. *See Blumer*, 20 A.3d 1222; *Harsh*, 840 A.2d 404. In such a case, the jury is permitted to find that the product in question was *both* defectively designed *and* that it malfunctioned. *See Blumer*, 20 A.3d 1222[8]; *Harsh*, 840 A.2d 404.[9]

---

[8] In *Blumer*, the jury verdict slip included specific questions that distinguished between the plaintiff's design defect and malfunction claims. Specifically, jury members were asked,

> 3. Do you find that the parking brake system on the subject vehicle malfunctioned on September 29, 2004?
> YES ___ NO ___
>
> ...
> 4. Do you find that this malfunction was a substantial factor in causing Joseph Blumer's death?
> YES ___ NO ___
>
> ...
> 5. Do you find that the parking brake system was defectively designed?

21

The most important inquiry in a strict products liability analysis under either a design defect claim or a malfunction claim is whether the product in question was defective. In *Harsh*, Douglas Harsh, his wife Connie, and their infant son Tyler were out driving in their new 1995 Chevrolet Lumina when they were rear-ended by a tractor trailer. 840 A.2d at 413. The collision caused the Lumina to burst into flames, and all three passengers died from smoke inhalation and severe burns. *Id.* At trial, the Harsh Estate argued that the Lumina's fuel system was defectively designed and manufactured,[10] thereby prompting General Motors (hereinafter "GM") to request that the jury be asked separate special interrogatories related to its potential liability under each theory. *Id.* at 438-39. The trial court rejected the interrogatories and asked the jury only whether there was simply "a defect in the 1995 Chevrolet Lumina owned by Douglas and Connie Harsh[.]" *Id.* at 439. In affirming the trial court's decision, our Commonwealth Court fittingly explained that "all that Plaintiffs had to prove was that the Lumina was sold in a defective condition and caused the harm,

---

YES ___ NO___

...

6. Do you find that the design defect or defects in the parking brake system was a substantial factor in causing Joseph Blumer's death?
YES ___ NO___

Jury Verdict Sheet, pp.1-2, *Blumer v. Ford Motor Co.*, G.D. No. 06-007766 (Pa. Com. Pl. Allegheny Mar. 19, 2009), *available at* https://dcr.alleghenycounty.us/DisplayImage.asp?gPDFOH=vol69700000301&CaseID=GD%2D06%2D007766&DocketType=VERDF&SeqNumber=71. Jury members answered "YES" to all four questions. *Id.*

[9] In *Harsh*, the jury verdict slip included general questions that did not distinguish between the Harshs' design defect and manufacturing claims. Specifically, jury members were asked,

Question 4:
Do you find that there was a defect in the 1995 Chevrolet Lumina owned by Douglas and Connie Harsh?
Yes _____ No _____

...

Question 5:
If you find that there was a defect in the 1995 Chevrolet Lumina owned by Douglas and Connie Harsh, was that defect a substantial factor in causing the deaths of the Harsh family on April 21, 1995?
Yes _____ No _____

*Harsh*, 840 A.2d at 439. Jury members answered "Yes" to both questions. Verdict, *Harsh v. Petroll*, No. CI-97-04352 (Pa. Com. Pl. Lancaster, June 20, 2001), *available at* http://prothonotary.co.lancaster.pa.us/civilcourt.public/(S(jvvcsg552q223h45spihyljb))/Handlers/DocumentHandler.ashx?vid=1008260

[10] *See supra* note 7.

22

and it did not matter if the jury came to that conclusion based on a finding that it was a manufacturing defect or a design defect or both." *Harsh*, 840 A.2d at 440 (citing *Phillips v. A-Best Prod. Co.*, 665 A.2d 1167 (Pa. 1995)); *see also Tincher*, 2014 WL 6474923, at *1 ("[A] plaintiff pursuing a cause of action upon a theory of strict liability in tort must prove that the product is in a 'defective condition.'").

We readily acknowledge that strict products liability claims involving vehicles often hinge on only one set of circumstances related to either a specific design defect or a malfunction. *See, e.g., Parr*, 2014 WL 7243152 (alleged design defect in the roof of a 2001 Ford Excursion such that the roof crushed after an accident and consequential roll down an embankment); *Gaudio*, 976 A.2d 524 (alleged design defect in the airbag system of a 1996 Ford F-150 such that the driver's side airbag should have deployed faster or not at all during a low speed collision); *Harsh*, 840 A.2d 404 (alleged design and manufacturing defects in the fuel system of a 1995 Chevrolet Lumina such that a fuel-fed fire would occur upon impact to the car from the rear); *Raskin*, 837 A.2d 518 (alleged malfunction in the seat of a 1989 Ford Escort such that it broke loose upon impact to the car from the rear); *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978 (Pa. Super. 2005) (alleged design defect in the cruise control system of an eighteen-wheel tractor trailer such that it remained stuck in the "on" position after application of the brakes and without a failsafe mechanism, and also that the truck's cab was structurally deficient following a roll-over accident); *Colville*, 809 A.2d 916 (alleged design and manufacturing defects in a Crown RR3020-45 standup forklift such that it was made without a door enclosing the operator's compartment that could prevent an operator's foot from post-accident injuries); *Kupetz*, 644 A.2d 1213 (alleged design and manufacturing defects in a Deere 350 bulldozer/crawler such that it was not equipped with a rollover protection system that could have prevented injuries during a rollover accident).

23

However, as we have written, we likewise recognize that advancing both a design defect claim and a malfunction claim based on only one set of circumstances is not prohibited in a products liability action. *See Blumer*, 20 A.3d 1222; *Harsh*, 840 A.2d 404. In *Blumer*, tow truck driver Joseph Blumer had just finished lowering a vehicle off the back of his Ford F-350 when the parking brake broke. 20 A.3d at 1225. The vehicle, which was in neutral gear, rolled down the hill it had been parked on and over Blumer, who eventually died underneath it. *Id.* "At trial [Blumer] proceeded on various causes of action, including negligence, defective design and failure to warn." *Id.* at 1229. On this point, our Superior Court noted,

> At the conclusion of trial, the jury found that ... Ford was negligent, that the parking brake system contained a design defect, that the parking brake system malfunctioned, and that ... Ford failed to warn of a defect in the parking brake system after it was sold. ... The jury also found that each of these bases for liability was a substantial factor in causing Mr. Blumer's death.

*Id.* at 1229 n.2 (internal citations omitted). On appeal, Ford did not argue that "the malfunction theory was unavailable to [Blumer], or that the evidence was insufficient to sustain a malfunction theory of liability." *Id.* Consequently, wrote the Superior Court, "the malfunction theory was properly submitted to the jury, and the jury's verdict in favor of [Blumer] on the malfunction theory was supported with sufficient evidence." *Id.*

Here, the Cancelleris argued that *two separate sets of circumstances* necessitated the advancement of both theories. First, they argued that there was direct evidence of a specific design defect with respect to the Sable's single FCS and mounting structure. *See supra* Part III(A). Additionally, but not mutually exclusively or alternatively, they argued that there was circumstantial evidence of a malfunction with respect to the Sable's RCM such that it fired the driver's side belt buckle pretensioner and should have deployed the driver's side airbag, but instead deployed the passenger's side airbag. *See infra* Part III(B)(4). Because the Cancelleris' simultaneous advancement of both

24

theories does not run afoul of our appellate case law, we find that Ford is not entitled to a JNOV on these grounds.

### 4. The Cancelleris proved the occurrence of a malfunction.

Alternative to the arguments addressed in *supra* Part III(B)(1)-(3), Ford also contends that even if the malfunction theory were applicable to this case, the Cancelleris "failed to establish the occurrence of a malfunction" because "[t]he mere fact that the passenger airbag deployed in the accident does not mean that the system malfunctioned …." Def.'s Post-Trial Motion, ¶¶ 75-76. On this point, Ford properly cites *Barnish*, where our Supreme Court wrote that "[t]he courts have noted that while the plaintiff need not demonstrate the actual product defect, the plaintiff 'cannot depend upon conjecture or guesswork.'" 980 A.2d at 542 (quoting *Dansak*, 703 A.2d at 496). However, the trial record, when viewed in a light most favorable to the Cancelleris, shows that the Cancelleris produced more than enough circumstantial evidence to prove the occurrence of a malfunction.

Cancelleris' expert, Caruso, first explained that in angled crashes "that [are] offset and [don't] actually hit the sensor itself," the crash pulse transmission needs to get to the FCS mounting structure and "continue to transmit [the crash] information to the sensor until it makes its decision," i.e., "deploy" or "no deploy." N.T., 34-35:25-12.; 35-36:25-1, 08/14/14 (McCool). The sensor information is then transmitted to "the primary airbag controller" known as the Restraint Control Module, or "RCM," which "physically turns on the airbags when the appropriate crash sensing information has been received … and get[s] them to deploy." *Id.* at 55-56:20-6. The RCM, said Caruso, is the Sable's "black box" that "monitors the state of health of the vehicle at all times and lets you know if something is wrong." *Id.* at 55:20-25. Unlike the FCS and fiberglass cross member located on the Sable's exterior, the RCM is located on the Sable's interior, notably "mounted on the floor under the carpet, … in between the two seats more or less." *Id.* at 57:12-16. Caruso further stated that the RCM connects to the FCS, to the Occupant Classification Sensor (hereinafter

25

"OCS"), to all the airbags, to the dashboard to be able to turn on and off the warning lamp if something is wrong, and to the passenger airbag deactivation lamp to determine whether the passenger airbag is going to be on or off if a collision should occur. N.T., 57:17-25, 08/14/14 (McCool).

With respect to the RCM's malfunction, Caruso testified that "there were no fault codes" detected upon inspection of the RCM after Cancelleri's accident. *Id.* at 63-64:21-1. This is significant, he opined, because "there was nothing wrong with the airbag module. There was nothing wrong with the [OCS]. There was nothing wrong—as far as the [RCM] knew, this airbag system was ready to go if a crash had occurred." *Id.* at 64:2-6. The RCM also knew that Cancelleri "was buckled at that time this event occurred" and also that the "passenger was unbuckled." *Id.* at 63:10-13. The passenger's side OCS, which "measure[es] the weight of any occupant," also recognized that the passenger seat was empty, which is important because the data from the OCS is transmitted directly to the RCM. *Id.* at 63:16-20; 57:12-19. Caruso explained that "the whole purpose of occupant detection or occupant classification" is to "[n]ever ... deploy an airbag if there is a risk of there being a child there," and therefore, "[t]here would be no reason to [deploy an airbag if there is an empty seat]." *Id.* at 66:5-9. Doing so, he said, amounts to "wasting the consumer's money because they have to go back and get that repaired." *Id.* at 66:10-11. Caruso therefore opined that because "the passenger side was unbuckled and the seat was empty, this deploying of the passenger bag would be a malfunction." *Id.* at 66:2-4.

The Cancelleris' malfunction claim was bolstered by Phillips, who testified that "the driver's side seat belt buckle pretensioner fired in this crash," meaning that the RCM "saw an impact and commanded that pretensioner to detonate." N.T., 28:17-21, 08/14/14 (Nardozzi). Interestingly, Phillips said that the passenger's side pretensioner did not fire. *Id.* at 28-29:22-9. On this point, Caruso testified that in "brick wall impacts," "approximately 12 miles per hour [will] deploy the

26

seatbelt pretensioner." N.T., 84:4-10, 08/14/14 (McCool). He further testified that a Stage 1 airbag deploys at "roughly 18 miles an hour" for a "belted occupant," and that a Stage 2 airbag deploys at "around 22 miles per hour" for an "unbelted occupant." N.T., 84-85:18-4, 08/14/14 (McCool). Giving all reasonable inferences to these experts' testimony, it is clear that the RCM felt a crash that meets the threshold for deploying Cancelleri's Stage 1 airbag, and even fired his driver's side belt buckle pretensioner to do so. However, *the RCM instead deployed the passenger's side airbag without even firing the passenger's side belt buckle pretensioner.* From this, we find that the Cancelleris' malfunction claim was rooted firmly in the fertile ground between mere "conjecture or guesswork" and the direct evidence implicating a specific design defect.

### 5. The Cancelleris established evidence eliminating abnormal use.

Ford does not challenge the evidence eliminating abnormal use presented by the Cancelleris. To establish this element, the Cancelleris simply relied on Cancelleri's own testimony. Specifically, Cancelleri's testimony that he was wearing his seatbelt immediately prior to the accident was undisputed, and no other testimony was presented that tended to indicate an abnormal use. D.T., 7-8:25-2. He further testified that he never had any service problems with his Sable in the five years that he owned it. *Id.* at 37:7-24. As such, it is clear that the Cancelleris satisfied the second element of their malfunction claim eliminating abnormal use of the Sable.

### 6. The Cancelleris established evidence eliminating reasonable secondary causes.

Next, Ford claims that the Cancelleris "failed to eliminate reasonable secondary causes for the alleged airbag system malfunction ...." Def.'s Post-Trial Motion, ¶ 78. Ford's main "reasonable secondary cause" for the RCM's deployment of the passenger's side airbag was articulated by Jennifer Yaek, P.E., an expert in accident reconstruction and investigation, vehicle dynamics, and crash test analysis, and Pearson. In particular, Yaek testified that the Sable travelled "about 160 feet from the point of impact with the Mustang to impact with the trees" within "five-and-a-half to six

27

seconds," and that the Sable entered the trees at "approximately 12 to 14 miles an hour" over "about 7 feet ...." N.T., 49:3-9; 49:15-16; 19-20:25-2, 08/19/14 (Gliem). Ultimately, Yaek opined based on these factors that the Sable's interaction with the trees was sufficient to reach the air bag deployment threshold for the passenger's side. N.T., 49-50:24-4, 08/19/14 (Gliem). In conjunction with Yaek's opinion, Pearson testified that, "Subsequent to [the Mustang event], the system went into an indeterminate state, and as a result of being in the indeterminate state, it ... default[ed] to deploy [the passenger's side airbag]." *Id.* at 31:3-5. "[I]n other words," he said, "if there's a power disruption to that particular circuit, then it will, like any other computer, go into a re-boot phase, and during the five to six seconds that it takes to reinitiate itself, it reports the state indeterminate to the RCM." *Id.* at 32:4-9.

Although Ford, via Yaek and Pearson, suggested a secondary cause for the RCM's purported malfunction, the Cancelleris presented more than enough evidence to meet their burden of negating Ford's theory. *See Roselli v. Gen. Elec. Co.*, 599 A.2d 685, 688 (Pa. Super. 1991) (Defendants' "burden is only to identify other possible non-defect oriented explanations" while "the plaintiffs have the burden of negating reasonable secondary causes for the accident which are fairly raised by the evidence." (citation omitted)), *appeal granted*, 607 A.2d 255 (Pa. 1992).

First, Cancelleri himself testified that the passenger's side airbag "went off right away" after the collision and not when the Sable went into the trees. D.T., 7:21-24; 30-32:16-4. EMS Provider Hoanzl testified that Cancelleri was alert and conscious during treatment, and that he received a perfect score on the Glasgow Coma Scale, which she stated is "a scale that we use to determine how alert and how with it [patients] are." N.T., 39-20:19-17, 08/13/14 (McCool).

Moreover, unlike Yaek, Trooper Boetcher testified that "[b]y the time [the Sable] reached the tree, it couldn't have been going more than five miles an hour." *Id.* at 25:17-18. He further testified that the Sable "came to rest" against one of the trees, that "it was too difficult to tell whether any

28

additional damage occurred from the tree because [of] the extensive damage from the impact with the Mustang," and that "the tree had sustained very little damage, if any," from the Sable. N.T., 15-16:20-22, 08/13/14 (McCool).

Phillips corroborated Boetcher's testimony when he opined that the Sable's contact speed with the tree was "about five miles an hour." N.T., 48:10-11, 08/14/14 (Nardozzi). He further opined that the Sable "never made it to the trunks and … just brushed up against the branches," and that there was "really nothing on the right side of the car" to indicate damage from the trees. *Id.* at 48:16-20; 44:22.[11] Additionally, Phillips challenged Yaek's opinion and testified that "12 to 14 miles per hour over 7 feet would not meet the deployment criteria timing based on an accident reconstruction standpoint." N.T., 43:11-14, 08/14/14 (Nardozzi). Using a mathematical braking coefficient, Phillips calculated and explained that the Sable would be utilizing minimal force "over 7 feet if you are doing 12 to 14 miles an hour." *Id.* at 46-47:7-6. He therefore concluded that under such circumstances, "you are not impacting the branches," but rather, "[y]ou are coming in contact with [them]." *Id.* at 47:6-7. He further stated that if the Sable had actually come into contact with the tree trunk, "You would see damage[, a]nd I would expect to see the branches snapped off to the trunks," which he did not. *Id.* at 47:18-23.

Caruso also challenged Yaek's conclusions, opining that "[i]n her own data, … 14 miles per hour over 7 feet equates to an equivalent barrier speed" of a brick wall impact at eight miles per hour, the severity of which is a "1 and a half mile per hour impact." N.T., 82:8-20, 08/14/14 (McCool). A threshold of "8 miles per hour and below," said Caruso, "is what Ford calls the no fire threshold," meaning that "[a]ny brick wall impact at 8 miles per hour or less [does] not fire the airbags." *Id.* at 82:13-15; 83-84:22-3. He therefore concluded that the Sable's "passenger airbag

---

[11] Specifically, Phillips noted that "[t]he headlight for the right front it is [sic] plastic. It is intact. The hood does not have any impact marks to it. The bumper beam does not have anything that would represent an impact from the tree." N.T., 44:18-21, 08/14/14 (Nardozzi).

deployment cannot be explained." N.T., 82:21-22, 08/14/14 (McCool). Furthermore, Caruso stated that even if Yaek's opinion that the Sable impacted the tree at 12 to 14 miles per hour were correct, "it still results in a nondeployment crash and does not explain the deployment of the passenger airbag." *Id.* at 87:10-17.

Notably, Ford's focus with regard to reasonable secondary causes of the RCM's purported malfunction addresses only those circumstances related to the Sable's passenger's side airbag deployment. While Ford attempts to frame this point as an airbag issue wholly unrelated to Cancelleri's injuries, the evidence clearly shows that it is not. As we have noted, it is evident that the RCM felt a crash that meets the threshold for deploying Cancelleri's Stage 1 airbag, and the RCM even fired the driver's side belt buckle pretensioner to do so. However, the RCM instead deployed the passenger's side airbag without even firing the passenger's side belt buckle pretensioner. Based on all relevant testimony, we find that while Ford may have suggested a secondary cause for the passenger's side airbag's deployment, it did not adequately establish how that deployment could reasonably occur in relation to the fired driver's side belt buckle pretensioner, the undeployed driver's side airbag, and the unfired passenger's side belt buckle pretensioner. Thus, Ford did not establish that its suggested secondary cause was in fact a reasonable one. Moreover, the Cancelleris met their burden of negating Ford's secondary cause, thereby satisfying the third element of their malfunction claim.

### 7. The Cancelleris were not required to prove the crashworthiness elements of a design defect claim as part of their malfunction claim.

Ford also argues that the malfunction theory "does not relieve the burden of establishing a defect," and that because "defect is but one element of a crashworthiness claim," the Cancelleris were still required to prove the remaining elements of the crashworthiness doctrine as part of their malfunction claim. Def.'s Post-Trial Motion, ¶ 74 (quoting *Dansak*, 703 A.2d at 496). In advancing its argument, Ford invokes *Raskin*, where our Superior Court wrote that "[a] defect is merely one

30

element of the crashworthiness doctrine." 837 A.2d 523. Though the cited quote is accurate, Ford elevates *Raskin* to an authority that prohibits the advancement of both a design defect claim under the crashworthiness doctrine and a malfunction claim in the same case. As we previously explained, it is not. *See supra* Part III(B)(3) ("In such a case, the jury is permitted to find that the product in question was *both* defectively designed *and* that it malfunctioned."); *Blumer*, 20 A.3d 1222; *Harsh*, 840 A.2d 404.

As we also previously explained, *Raskin* and the matter *sub judice* are distinct from one another. In *Raskin*, Plaintiff Lee Robin Raskin sued Ford based on only one set of circumstances, namely that the seat of her 1989 Ford Escort malfunctioned when it broke loose after a rear-end collision. *See Raskin*, 2002 WL 34078126. Although she advanced a textbook "second collision" case, Raskin could not present direct evidence of a specific design defect. She therefore used the malfunction theory as "an evidentiary tool" to "prove the existence of a defect," i.e., that her Escort was not crashworthy. *Raskin*, 837 A.2d at 523. Here, the Cancelleris established that *two separate sets of circumstances* necessitated the advancement of both theories. First, Plaintiffs argued that there was direct evidence of a specific design defect with respect to the Sable's single FCS and mounting structure. *See supra* Part III(A). Additionally, but not mutually exclusively or alternatively, Plaintiffs argued that there was circumstantial evidence of a malfunction with respect to the Sable's RCM such that it fired the driver's side belt buckle pretensioner and should have deployed the driver's side airbag, but instead deployed the passenger's side airbag. *See supra* Part III(B)(4). Again, because the simultaneous advancement of these theories does not run afoul of our appellate case law, we find that Ford is not entitled to a JNOV on these grounds.

C. *The Cancelleris proved the elements necessary to establish their design defect claim under the crashworthiness doctrine and their malfunction claim by a preponderance of the evidence, and therefore, Ford is not entitled to JNOV on Rosetta Cancelleri's loss of consortium claim.*

Ford further contends that, "To the extent there was insufficient evidence to support ... Cancelleri's design defect and product malfunction claims, [Rosetta Cancelleri's] loss of consortium claim fails as a matter of law." Def.'s Post-Trial Motion, ¶ 82 (citations omitted). A loss of consortium is "a loss of services, society, and conjugal affection of one's spouse." *Darr Const. Co. v. W.C.A.B. (Walker)*, 715 A.2d 1075, 1080 (Pa. 1998) (citations omitted). "While it stems from the spouse's bodily injury, it is nevertheless a separate and distinct claim." *Id.* Since we have already found that the Cancelleris proved the elements necessary to establish their design defect claim under the crashworthiness doctrine and their malfunction claim, we find that Ford's argument on Rosetta Cancelleri's loss of consortium claim fails.

## IV. Standard of Review for a New Trial

Alternative to its argument that it is entitled to a JNOV, Ford claims that it is entitled to a new trial because we "erred in failing to grant Ford's Motion for Compulsory Nonsuit" on the Cancelleris' design defect, malfunction, and loss of consortium claims, because we "erred in failing to grant Ford's Motion for a Directed Verdict" on those claims, because our "jury instructions were erroneous and prejudicial," because our "verdict form was erroneous and prejudicial," because we "erred in precluding Ford's experts' surrogate study to rebut [the Cancelleris'] causation theory," because we "erred in refusing to apply the Restatement (Third) of Torts: Products Liability and admit evidence of industry standards," and because we "erred in excluding evidence concerning tests by NHTSA and the IIHS during Mr. Caruso's cross-examination." *See* Def.'s Post-Trial Motion, Part II.

Our appellate courts have articulated that "[t]here is a two-step process that a trial court must follow when responding to a request for a new trial ...." *Ferguson v. Morton*, 84 A.3d 715, 719-

32

720 (Pa. Super. 2013) (quoting *Harman v. Borah*, 756 A.2d 1116, 1222 (Pa. 2000) (citations omitted)),

*appeal denied*, 97 A.3d 745 (Pa. 2014).

> First, the trial court must decide whether one or more mistakes occurred at trial.
> Second, if the trial court concludes that a mistake (or mistakes) occurred, it must
> determine whether the mistake was a sufficient basis for granting a new trial. The
> harmless error doctrine underlies every decision to grant or deny a new trial. A
> new trial is not warranted merely because some irregularity occurred during the
> trial or another trial judge would have ruled differently; the moving party must
> demonstrate to the trial court that he or she has suffered prejudice from the
> mistake.

*Ferguson*, 84 A.3d at 720 (quoting *Harman*, 756 A.2d at 1222) (citations omitted).

### A. We properly denied Ford's Motions for a Compulsory Nonsuit and a Directed Verdict.

At the close of the Cancelleris' case on August 18, 2014, Ford orally requested a compulsory

nonsuit in its favor on all of the Cancelleris' claims based on the supposedly inadequate production

of evidence. N.T., 9-13:11-12, 08/18/14 (Nardozzi). Our rules provide that "the court, on oral

motion of the defendant, may enter a nonsuit on any and all causes of action if, at the close of the

plaintiff's case on liability, the plaintiff has failed to establish a right to relief." Pa.R.C.P. 230.1(a)(1).

In determining whether the plaintiff has established a right to relief,

> [t]he plaintiff must be allowed the benefit of all favorable evidence and
> reasonable inferences arising therefrom, and any conflicts in the evidence must
> be resolved in favor of the plaintiff. Further, [i]t has been long settled that a
> compulsory nonsuit can only be granted in cases where it is clear that a cause of
> action has not been established. However[,] where it is clear a cause of action has
> not been established, a compulsory nonsuit is proper.

*Staiger v. Holohan*, 100 A.3d 622, 624 (Pa. Super. 2014) (quoting *Braun v. Target Corp.*, 983 A.2d 752,

754 (Pa. Super. 2009), *appeal denied*, 987 A.2d 158 (Pa. 2009)). Based on the evidence put forth by the

Cancelleris (described at length in *supra* Part III), we denied Ford's request for a compulsory nonsuit

and find no error in having done so. N.T., 9-19:11-16, 08/18/14 (Nardozzi).

At the close of all evidence on August 20, 2014, Ford made the same request for judgment

in its favor in the form of a request for a directed verdict. N.T., 71:5-13, 08/20/14 (Gliem). Our

rules similarly provide that, "At the close of all evidence, the trial judge may direct a verdict upon the oral or written motion of any party." Pa.R.C.P. 226(b). The "standard[s] of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical." *Reott*, 7 A.3d at 835 (quoting *Campisi v. Acme Markets, Inc.*, 915 A.2d 117, 119 (Pa. Super. 2006) (citation omitted)). Consequently, we again denied Ford's request based on the evidence described in *supra* Part III, and find no error in having done so. N.T., 4:9-18, 08/21/14 (Nardozzi).

### B. We properly instructed the jury with regard to the malfunction doctrine.

Ford's primary argument for a new trial is that we erred when instructing the jury on the malfunction doctrine. Specifically, Ford first contends that "the malfunction doctrine was not applicable to this case" because the Cancelleris had possession of the allegedly defective Sable, "and therefore, the rationale underlying the malfunction theory is wholly inapplicable." Def.'s Post-Trial Motion, ¶¶ 100-01. We previously described the malfunction doctrine in *supra* Part III(B).

Despite Ford's contention, there are three important precepts of Pennsylvania law consistent with our decision that we have also previously articulated. *See supra* Part III(B)(1)-(3). First, a plaintiff is not prohibited from advancing a malfunction claim simply because that plaintiff has access to or possession of the allegedly defective product in question. *See Raskin*, 837 A.2d at 521 n.2 (plaintiff advanced a malfunction claim despite the fact that her "father retained ownership of the [allegedly defective] vehicle at the time of [the] action's 1992 commencement and for a significant period thereafter ...."). Second, a plaintiff is not prohibited from advancing a malfunction claim in a crashworthiness case. *See Raskin*, 837 A.2d 518 (plaintiff averred that the seat of her 1989 Ford Escort malfunctioned when it broke loose after a rear-end collision, thereby prompting the trial court to instruct on both the malfunction and crashworthiness doctrines); *Harsh*, 840 A.2d 404 (allowing the plaintiff to advance both a specific design defect claim under the crashworthiness

doctrine and a malfunction claim[12]). Third, the law does not force a plaintiff to choose between advancing either a specific design defect claim or a malfunction claim. *See Blumer*, 20 A.3d at 1229 ("At trial, Plaintiff proceeded on various causes of action, including negligence, defective design and failure to warn. Notably, Plaintiff also advanced a strict product liability claim pursuant to a product malfunction theory."); *Harsh*, 840 A.2d 404.

Moreover, these concepts do not run afoul of our Superior Court's assertion that the crashworthiness and malfunction doctrines "are not mutually exclusive, nor are they alternative theories of recovery in a products liability case." *Raskin*, 537 A.2d at 522-23. Stated simply, a plaintiff can advance both a design defect claim and a malfunction claim so long as they are not to each other's exclusion and so long as they are not pled in the alternative. *See Blumer*, 20 A.3d 1222; *Harsh*, 840 A.2d 404. In such a case, the jury is permitted to find that the product in question was *both* defectively designed *and* that it malfunctioned. *See Blumer*, 20 A.3d 1222[13]; *Harsh*, 840 A.2d 404.[14] After all, the most important inquiry in a strict products liability analysis under either a design defect claim or a malfunction claim is whether the product in question was defective. Critically, "all that Plaintiffs ha[ve] to prove [is] that the [vehicle] was sold in a defective condition and caused the harm, and it [does] not matter if the jury came to that conclusion based on a finding that it was a manufacturing defect or a design defect or both." *Harsh*, 840 A.2d at 440[15] (citing *Phillips v. A-Best Prod. Co.*, 665 A.2d 1167 (Pa. 1995)); *see also Tincher*, 2014 WL 6474923, at *1 ("[A] plaintiff pursuing a cause of action upon a theory of strict liability in tort must prove that the product is in a 'defective condition.'") With these concepts in mind, we turn to our instructions.

---

[12] *See supra* note 7.

[13] *See supra* note 8.

[14] *See supra* note 9.

[15] *See supra* note 7.

When instructing the jury, our objective "is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." *Tincher*, 2014 WL 6474923, at *16 (quoting *Commonwealth v. Chambers*, 980 A.2d 25, 49-50 (Pa. 2009)). In determining whether we committed error in charging the jury and thereby necessitating a new trial, our scope of review is limited to determining whether we "committed a clear abuse of discretion or error of law controlling the outcome of the case." *Passarello v. Grumbine*, 87 A.3d 285, 296 (Pa. 2014) (quoting *Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1069 (Pa. 2006)). In reviewing our charge to the jury, "we must look to the charge in its entirety." *Id.* (quoting *Quinby*, 907 A.2d at 1070). As our Supreme Court has written,

> Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Error will be found where the jury was probably [misled] by what the trial judge charged or where there was an omission in the charge. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error.

*Id.* (quoting *Quinby*, 907 A.2d at 1069-70).

In *Raskin*, Plaintiff Lee Robin Raskin sued Ford based on only one set of circumstances, namely that the seat of her 1989 Ford Escort malfunctioned when it broke loose after a rear-end collision. *See Raskin*, 2002 WL 34078126. At trial, Raskin could not present direct evidence of a specific design defect, and therefore, she used the malfunction theory as "an evidentiary tool" to "prove the existence of a defect," i.e., that her Escort was not crashworthy. *Raskin*, 837 A.2d at 523. Because Raskin's claim was a textbook "second collision" case, the trial court instructed on the crashworthiness doctrine in addition to the malfunction doctrine. *Id.* Thereafter, the jury returned a verdict in favor of Ford, notably finding that there was "no defect in the seat and/or restraint system." *Id.* at 521. On appeal, Raskin argued that "the trial court improperly instructed the jury on

36

the doctrine of crashworthiness instead of limiting its instructions to the doctrine of malfunction."

*Raskin*, 837 A.2d at 522. Quoting our Supreme Court, our Superior Court wrote,

> The doctrine of malfunction is an evidentiary tool whereby a plaintiff may prove the existence of a defect. It has been explained as follows:
> In most instances the plaintiff will produce direct evidence of the product's defective condition. In some instances, however, the plaintiff may not be able to prove the precise nature of the defect in which case reliance may be had on the "malfunction" theory of product liability. This theory encompasses nothing more than circumstantial evidence of product malfunction. It permits a plaintiff to prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable, secondary causes for the malfunction. It thereby relieves the plaintiff from demonstrating precisely the defect yet it permits the trier-of-fact to infer one existed from evidence of the malfunction, of the absence of abnormal use and of the absence of reasonable, secondary causes.

*Raskin*, 837 A.2d at 523 (quoting *Rogers v. Johnson & Johnson Products, Inc.*, 565 A.2d 751, 754 (Pa. 1989) (citations omitted)). Significantly, although our Superior Court clearly distinguished between the malfunction and crashworthiness doctrines, its affirmation of the trial court's ruling in *Raskin* unmistakably shows that a trial court may instruct the jury on both the malfunction and crashworthiness theories. In affirming the trial court's instructions, our Superior Court wrote,

> The trial court instructed the jury according to the malfunction doctrine:
>
> > Now, I would like to talk to you about proving a defect by proving a malfunction. A plaintiff in a strict products liability case, which is another way of saying a products liability case, may prove her case merely by showing the occurrence of a malfunction of a product during normal use. The plaintiff does no [sic] have to prove the existence of a specific defect in the product.
> > The plaintiff has to prove three facts. She must prove that the product malfunctioned; that it was given only normal or anticipated usage before the injuries occurred, and that there is no reasonable secondary cause that was responsible for causing the enhanced injuries.
>
> Accordingly, Appellant received the maximum benefit of the malfunction doctrine.

*Id.* (quoting Trial Court Notes of Testimony, 77, Sept. 25, 2000).

37

Furthermore, as we have noted, advancing both a design defect claim and a malfunction claim based on only one set of circumstances, let alone two, is not prohibited in a products liability action. *See Blumer*, 20 A.3d at 1229 ("At trial, Plaintiff proceeded on various causes of action, including negligence, defective design and failure to warn. Notably, Plaintiff also advanced a strict product liability claim pursuant to a product malfunction theory."); *Harsh*, 840 A.2d 404.

As such, for the jury's benefit, we instructed on the malfunction doctrine using nearly the exact same legal standards set forth by our Superior Court in combination with nearly the exact same instructions provided by the trial court in *Raskin*, 537 A.2d at 523 (quoting Trial Court Notes of Testimony, 77, Sept. 25, 2000). Specifically, we instructed that,

> Under Pennsylvania law, the crashworthiness theory and the malfunction theory are not mutually exclusive, nor are they alternative theories of recovery in a products liability case such as this one. In most instances, a plaintiff will produce direct evidence of the product's defective condition. In some instances, however, the plaintiff may not be able to prove the precise nature of the defect, in which case reliance may be had on the "malfunction" theory of product liability. This theory encompasses nothing more than circumstantial evidence of product malfunction. It permits a plaintiff to prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable, secondary causes for the malfunction. It thereby relieves the plaintiff from demonstrating precisely the defect, yet it permits you, the triers-of-fact, to infer that a defect existed from evidence of the malfunction, the absence of abnormal use, and of the absence of reasonable, secondary causes.
>
> As such, the Cancelleris may prove their case under a malfunction theory merely by showing the occurrence of a malfunction of the airbag restraint system of the 2005 Mercury Sable during normal or anticipated use. They need not prove the existence of a specific defect in the product. Rather, the Cancelleris must prove three facts: that the system malfunctioned; that it was given only normal or anticipated use before Mr. Cancelleri's injuries occurred; and that there is no reasonable secondary cause that was responsible for causing the injuries resulting from the malfunction.

N.T., 95-97:20-7, 08/21/14 (Nardozzi). Overall, we find that the recitation of our Superior Court's articulation of the relationship between the malfunction and crashworthiness theories in combination with the trial court's malfunction instruction in *Raskin* provided the Cancelleris with a

38

correct and relevant summation of their legal claims while also providing Ford the full benefit of the distinctions between the two doctrines.

Additionally, Ford relies on a question submitted by the jury during its deliberations to argue that the jury was confused. Specifically, approximately one hour into deliberations, the jury wrote,

> As the Judge described the questions asked for the verdict he mentioned a choice of malfunction but yet it is not on the verdict's questionnaire. On the verdict questionnaire there are only options for a defective.[16] There is a little confusion over this.

N.T., 126:14-20; 130:7-13, 08/21/14 (Nardozzi). Using this question, Ford speculates,

> 113. The jury was clearly confused on the material issue of design defect and was permitted to improperly rely on the malfunction theory to find design defect where the evidence otherwise could not support it. The jury was further confused by the Court's instruction on the "separate theory" of malfunction in light of the absence of malfunction from the verdict form.

Def.'s Post-Trial Motion, ¶ 113. Here, Ford's contention that the jury was overly and materially confused with respect to the questions it was asked to answer is purely conjectural. Jury members were instructed, in accordance with *Raskin*, on the differences between the crashworthiness and malfunction theories before this question arose and, approximately ninety minutes into their deliberations, they were instructed again on the same differences. The jury's language is indicative of their firm grasp of the issues before it, as they label malfunction a "choice" among other "options" regarding a defect. This is entirely consistent with the Cancelleris' advancement of claims under design defect, malfunction, and duty to warn, and it is also entirely consistent with our instruction that the Cancelleris were attempting to recover under three subsets of liability. It is entirely possible and even plausible that the jury's question arose based on our granting the Cancelleris' request to remove from the verdict sheet those questions related to their malfunction claim while also granting their request to instruct the jury on their malfunction claim. Irrespective of this, "[w]e have a history

---

[16] This is the exact language the jury used when framing its question. We note here that Ford's Post-Trial Motion alludes to a potential error in this question's transcription, Def.'s Post-Trial Motion, ¶ 112, n.3, but that, upon further review of this matter's preserved audio recording, the jury's question was accurately transcribed.

of not permitting attacks on a verdict on the basis of evidence concerning jury deliberations because we are not interested in how the jury got to a result that the evidence supports ...." *Harsh v. Petroll*, No. 4352–1997, 2002 WL 3407557, at *17 (Pa. Com. Pl. Lancaster June 25, 2002) (quoting *Management of Civil Trials*, in *Handbook for Pennsylvania Trial Judges* (Pa. Conf. of State Trial Judges eds., 1st ed. 2000)), *aff'd*, 840 A.2d 404, 439. Despite the impetus for submitting the question, "[t]here is no requirement in the law that the jury specify how it came to the conclusion that the vehicle contained a defect," *Harsh*, 2002 WL 3407557, at *17, and any supposed jury confusion alleged by Ford was evidently resolved within thirty minutes of our second instruction when the jury returned a unanimous verdict.

In the alternative, Ford asserts that, "even if the malfunction doctrine were applicable, the Court erred by (1) charging the jury on malfunction as a separate theory of recovery; and (2) failing to properly charge the jury on the elements of crashworthiness as part of [the Cancelleris'] burden of proof to establish strict liability upon proof of malfunction." Def.'s Post-Trial Motion, ¶ 102. In explaining its position, Ford contends that,

> 109. While the Court did charge on the crashworthiness doctrine, the charge as a whole was erroneous because it failed to make clear that even though [the Cancelleris] could (if the doctrine were even applicable) prove the first element of their crashworthiness claim—defect—under the malfunction doctrine, they were still required to establish the other requisite elements of their crashworthiness claim.
> ...
> 111. The Court's charge therefore permitted the jury to find Ford liable simply based on conclusory circumstantial evidence of only one element of [the Cancelleris'] crashworthiness claim under a theory that never should have been charged in the first place.

*Id.* at ¶¶ 109; 111. As noted *supra*, we instructed the jury in accordance with the principles set forth by our Superior Court in *Blumer*, which affirmed a jury verdict in favor of the plaintiff and against Ford on claims under separate design defect and malfunction theories, *inter alia*, 20 A.3d at 1129 n.2, and in *Raskin*, which affirmed the trial court's instructions clearly distinguishing the crashworthiness

40

doctrine from the malfunction doctrine. 837 A.2d at 522-23. Though it has been over a decade since our Superior Court decided *Raskin*, we emphasize that that the current malfunction instruction under the Pennsylvania Standard Civil Jury Instructions has remained unchanged, and was used both in *Raskin* and the case *sub judice*:

> 16.90 (Civ) STRICT LIABILITY UPON PROOF OF MALFUNCTION
> A plaintiff in a strict liability case may prove his or her case merely by showing the occurrence of a malfunction of a product during normal use. The plaintiff need not prove the existence of a specific defect in the product. The plaintiff must prove three facts: that the product malfunctioned, that it was given only normal or anticipated use prior to the accident, and that no reasonable secondary causes were responsible for the accident.

Pa. SSJI (Civ), § 16.90 (2013). This instruction, given twice within approximately ninety minutes in combination with the crashworthiness standard articulated in our Superior Court's most recent crashworthiness cases, *Parr*, 2014 WL 7243152, at *3, and *Gaudio*, 976 A.2d at 532, and the explanation of the differences between the crashworthiness and malfunction doctrines set forth by our Superior Court in *Raskin*, 837 A.2d at 522-23, represents the current state of the law in Pennsylvania. As such, we find that these jury instructions as a whole reflect a clear and accurate recital of the relevant law related to the claims advanced by the Cancelleris, and therefore, no error was made.

Even speculating that instructing the jury on the malfunction doctrine was error, we fail to see how Ford was prejudiced to the extent that it is entitled to the extraordinary remedy of a new trial. As we have quoted, "A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently ...." *Ferguson*, 84 A.3d at 720 (quoting *Harman*, 756 A.2d at 1222) (citations omitted). Here, even though the Cancelleris advanced a malfunction claim distinct from their crashworthiness claim and thereby requested that the jury be instructed on both, they agreed with Ford, quite significantly, that the jury should not be asked to answer on its verdict sheet any questions related to an alleged malfunction. The result, simply put,

41

was a verdict sheet that asked the jury to decide whether the Sable's airbag/restraint system was "defective in design," which is commensurate with their design defect claim under the crashworthiness doctrine, and not whether the system had malfunctioned. Therefore, we fail to see how Ford could have been prejudiced to the extent that it is entitled to a new trial based on a malfunction claim that the Cancelleris ultimately did not ask the jury to decide.

### C. The verdict sheet appropriately allowed the jury to determine the relevant factual issues.

Despite acknowledging that we "did charge on the crashworthiness doctrine," Def.'s Post-Trial Motion, ¶ 109, Ford argues that we "erred by failing to include all of the required crashworthiness elements in a crashworthiness case on the verdict form." *Id.* at ¶ 116. Ford does not, however, cite to any authority that obligates us to do so. Indeed, none exists.

In *Harsh*, our Commonwealth Court rejected a request by GM to include special interrogatories on the verdict sheet entailing the specific elements of the crashworthiness doctrine in favor of a general verdict sheet. 840 A.2d 404. As we have previously written, the Harsh family was out driving a new 1995 Chevrolet Lumina when they were rear-ended by a tractor trailer. *Id.* at 413. The Lumina burst into flames on impact, and all three Harshes died from smoke inhalation and severe burns. *Id.* At trial, the Harsh Estate argued that the Lumina's fuel system was defectively designed and manufactured,[17] thereby prompting GM to request that the following question, among others, be included on the final verdict sheet:

> 6. Do you find that the use of the alternative design proposed by the plaintiffs for the fuel system in the 1996 Chevrolet Lumina would have prevented the death of:
>
> Douglas Harsh     Yes ____ No ____
> Connie Harsh      Yes ____ No ____
> Tyler Harsh       Yes ____ No ____

---

[17] *See supra* note 7.

*Harsh*, 840 A.2d at 438. It is clear that this question was intended to encapsulate the crashworthiness

doctrine's element entailing what injuries, if any, the plaintiffs would have sustained if the alleged

alternative, safer design had been used. *See Parr*, 2014 WL7243152, at *3; *Gaudio*, 976 A.2d at 532;

*Raskin*, 837 A.2d at 523; *Colville*, 809 A.2d at 923; *Kupetz*, 644 A.2d at 1218. However, "after

deliberating and consulting the Handbook for State Trial Judges published by the Pennsylvania

Conference of State Trial Judges, the trial court judge determined that because Plaintiffs only had to

prove that the Lumina was defective, a general verdict would be more appropriate." *Harsh*, 840 A.2d

at 439. As such, the trial court rejected the specific interrogatories suggested by GM in favor of only

two broad questions related to crashworthiness:

> Question 4:
> Do you find that there was a defect in the 1995 Chevrolet Lumina owned by
> Douglas and Connie Harsh?
> Yes _____ No _____
>
> ...
> Question 5:
> If you find that there was a defect in the 1995 Chevrolet Lumina owned by
> Douglas and Connie Harsh, was that defect a substantial factor in causing the
> deaths of the Harsh family on April 21, 1995?
> Yes _____ No _____

*Id.* The trial court fully explained its rationale for doing so, which was later affirmed by our

Commonwealth Court:

> Under the law of Pennsylvania, the plaintiff is required to prove only that the
> product was defective. The plaintiffs in this case presented credible and
> substantial evidence from which the jury could have concluded that the Harsh
> Lumina contained a manufacturing defect or a design defect or both. These are
> alternative theories which the jury can consider when deciding the basic question
> of whether the product was defective. There is no requirement in the law that the
> jury specify how it came to the conclusion that the vehicle contained a defect.
>
> I note that in the *Handbook for State Trial Judges* published by the Pennsylvania
> Conference of State Trial Judges there is a discussion of special verdicts in civil
> jury trials. The *Handbook* notes:
>
> > "We have a history of not permitting attacks on a verdict on the basis of
> > evidence concerning jury deliberations because we are not interested in
> > how the jury got to a result that the evidence supports ... Since this is a

> group process, a jury may not do a good job in explaining how ten of the twelve jurors arrive at a final decision that the evidence will support. We weaken the right of the parties to have their case decided by a jury rather than by a judge if we use a structure that is designed to evaluate the process by which the jury decided a case." *Handbook for State Trial Judges*, "Management of Civil Jury Trials," Pennsylvania Conference of State Trial Judges, First Edition.

*Harsh*, 840 A.2d at 439-40 (quoting *Harsh*, No. 4352–1997, 2002 WL 3407557, at *16-17). With its explanation, the trial court plainly rejected GM's argument that "the trial court's failure to provide the jury with the special interrogatories eliminated the alternative design element under the crashworthiness portion of the design defect claim." *Id.* at 440. As our Commonwealth Court noted when affirming the ruling, "because the ultimate question, after all, was whether the product was defective, it was not an abuse of discretion for the trial court judge to refuse GM's request to submit the special interrogatories." *Id.* Wrote the Court,

> ... Plaintiffs did not have to prove that the Lumina was defective under a particular theory of strict liability, but only that the Lumina was sold in a defective condition and caused the Harsh's deaths. Regardless of whether the Lumina was designed improperly or manufactured improperly, in this case, the jury determined that the Harshs died as a result of a defective GM product. Consequently, the trial court did not err with regard to the verdict slip.

840 A.2d at 440-41 (internal footnote omitted).

"A party is not entitled to have special interrogatories submitted to the jury." *Fritz v. Wright*, 907 A.2d 1083, 1091 n.8 (Pa. 2006) (citation omitted); *Harsh*, 840 A.2d at 440 (citation omitted). "Rather, the decision whether to submit special interrogatories to a jury is a ruling left to the discretion of the trial court." *Fritz*, 907 A.2d at 1091 n.8 (citation omitted); *Harsh*, 840 A.2d at 440 (citation omitted). In particular, "[t]he trial court judge may grant or refuse a request for special interrogatories on the basis of whether they would add to the logical and reasonable understanding of the issues." *Harsh*, 840 A.2d at 440 (citing *Century 21 Heritage Realty, Inc. v. Blair*, 563 A.2d 114 (Pa. Super. 1989)).

The ultimate issue here was whether the product in question was defective. If the jury was simply asked whether the airbag/restraint system in the subject 2005 Mercury Sable was defective, then the Cancelleris' current argument that "there was circumstantial evidence from which a jury could infer a defect (malfunction)" would be more applicable to the issue of whether the verdict sheet was erroneous. *See* Pls.' Brief in Opp., p.27, 11/05/14. If such a verdict question were posed, as we have written, all that the Cancelleris would have to prove was that the Sable "was sold in a defective condition and caused the harm, and it [would] not matter if the jury came to that conclusion based on a finding that it was a manufacturing defect or a design defect or both." *Harsh*, 840 A.2d at 440[18] (citing *Phillips* 665 A.2d 1167).

However, unlike GM in *Harsh*, Ford in this case had the added benefit of specificity. Instead of simply asking whether the Cancelleris' 2005 Mercury Sable was defective, this jury was asked whether the particular product in question, the airbag/restraint system, was *defectively designed*, and *also* whether there was an alternative, safer, and practicable design. Jurors were further asked whether any such defect factually caused or exacerbated Cancelleri's injuries. Notably, jurors were instructed twice on the Cancelleris' burden of proof with respect to their design defect claim even before they first began their deliberations, and they were supplied with ample evidence at trial that the putative safer designs put forth by the Cancelleris' experts would have prevented all of the injuries that John Cancelleri sustained. *See supra* Part III(A)(2). As a result, asking them to determine on the verdict sheet "what injuries, if any, the plaintiffs would have sustained if the alleged alternative, safer design had been used" seemed to add little, if any, further material understanding of the issues.

### D. We properly granted the Cancelleris' Motion in Limine to Preclude Ford's Experts' Surrogate Studies

Ford next contends that we "erred in precluding Ford's Experts' surrogate studies to rebut plaintiffs' causation theory." Def.'s Post-Trial Motion, Part G. This issue was not raised at trial, but

---

[18] *See supra* note 7.

rather, in the Cancelleris' Motion *in Limine* to preclude the studies. *See* Pls.' Motion *in Limine* to Preclude Certain Ford Crash Testing, Surrogate Work, and Photographs, 06/06/14. In addition to the arguments addressed herein, Ford claims that "the [surrogate] studies were relied on by Ford's experts, and therefore, testimony regarding those materials is not simply permitted by Pennsylvania Rule of Evidence 705, but is mandatory." Def.'s Post-Trial Motion, ¶ 136 (citations omitted). We initially find that this argument overlooks the significant "if" which begins the conditional sentence that is Rule 705. The question of whether, or if, an expert is allowed to state an opinion to a jury is a question for the court, as it is well-established that "the admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion." *Commonwealth v. Safka*, 95 A.3d 304, 307 (Pa. 2014) (citations omitted); *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003).

Generally, a motion *in limine* "is used before trial to obtain a ruling on the admissibility of evidence." *Parr*, 2014 WL 7342152, at *5 (citing *Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.*, 933 A.2d 664 (Pa. Super. 2007), *appeal denied*, 947 A.2dd 737 (Pa. 2008)). Such a motion "gives the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury." *Id.* (quoting *Commonwealth v. Reese*, 31 A.3d 708, 715 (Pa. Super. 2011) (en banc)). "A trial court's decision to grant or deny a motion *in limine* 'is subject to an evidentiary abuse of discretion standard of review.'" *Id.* (quoting *Reese*, 31 A.3d at 715). As our Superior Court has recently articulated,

> Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. *Commonwealth Financial Systems, Inc. v. Smith*, 15 A.3d 492, 496 (Pa.Super.2011) (citing *Stumpf v. Nye*, 950 A.2d 1032, 1035-1036 (Pa.Super.2007)). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Grady v. Frito-Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038, 1046 (Pa.2003).

46

*Parr*, 2014 WL 7342152, at \*5 (quoting *Keystone Dedicated Logistics, LLC v. JGB Enter., Inc.*, 77 A.3d 1, 11 (Pa. Super. 2013)). Additionally, "to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Id.* (quoting *Winschel v. Jain*, 925 A.2d 782, 794 (Pa. Super. 2007) (citation omitted), *appeal denied*, 940 A.2d 366 (Pa. 2008)).

### 1. Relevant Evidence Standard

Our evidentiary determinations are primarily guided by our Rules of Evidence and our standards for relevance. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "Whether evidence has a tendency to make a given fact more or less probable is to be determined by the court in the light of reason, experience, scientific principles, and the other testimony offered in the case." Pa.R.E. 401 cmt. Moreover, "[t]he relevance of proposed evidence may be dependent on evidence not yet of record." *Id.* "All relevant evidence is admissible, except as otherwise provided by law[,]" and "[e]vidence that is not relevant is not admissible." Pa.R.E. 402. "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "Unfair prejudice" means "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 cmt.

### 2. Demonstrative Evidence Standard

"The admissibility of evidence, including demonstrative evidence, rests largely within the discretion of the trial court." *Harsh*, 840 A.2d at 421 (citing *Leonard by Meyers v. Nichols Homeshield, Inc.*, 557 A.2d 743, 745 (Pa. Super. 1989), *appeal denied*, 575 A.2d 115 (Pa. 1990)).

Both our Superior Court and Commonwealth Court have opined that, "Where the demonstration of evidence is a physical representation of the incident or event, the conditions must

47

be sufficiently close to those involved in the accident at issue to make the probative value of the demonstration outweigh the prejudicial effects." *Harsh*, 840 A.2d at 421 (citing *Leonard*, 557 A.2d at 745). However, our Superior Court has also noted that "[e]xperiments showing general properties of materials are admitted without confining the experiments to conditions surrounding the litigated situation." *Leonard by Meyers*, 557 A.2d at 747 n.6 (citing *McCormick on Evidence* § 202, 603 n.25, 26 (3d ed. 1984)). According to the Court, "a test undertaken to obtain greater scientific knowledge of general principles ... as opposed to an experiment commissioned for a specific law suit ... has the added advantage of being untainted by an interest in the litigation." *Id.*

a. The Marth Study

Ford proposed to introduce evidence of two surrogate experiments, both of which were commissioned by Ford and undertaken less than a year before the start of this matter's trial. The first experiment was performed by Ford's biomechanical expert, Dr. Debora Marth, on October 7, 2013. In particular, Marth used an "exemplar vehicle ... built in April of 2004" and a male surrogate "who was generally the same height and weight as ... Cancelleri at the time of the subject accident," Def.'s Expert Report by Debora Marth (hereinafter "Marth Report"), p.15, 10/10/13, to experiment as follows:

1. "The steering wheel and the driver's seat were adjusted to the positions they were found in at the time of [Marth's] inspection of [Cancelleri's Sable]." *Id.* at 15.

2. The surrogate "was placed in the driver's seat with the seat belt worn properly." *Id.*

3. "[T]he seat position was matched as closely as possible [to] the position depicted in the report written by [Cancelleri's] expert ...." *Id.* at 16.

4. "With the seat in this position, the surrogate's chest was approximately 13 inches from the airbag module. His head was about 15 inches from the upper rim of the steering wheel." *Id.*

48

5. "[T]he surrogate was asked to flex his head and neck forward toward the steering wheel to simulate occupant kinematics in [Cancelleri's] accident." *Id.*

6. "[T]he surrogate was asked to present his head to the steering wheel upper rim to demonstrate the contact location required to produce the laceration sustained by [Cancelleri]." *Id.*

In support of its proposed admissibility into evidence, Ford argued that Marth's surrogate work was "in no way conducted to replicate or recreate the subject accident," and that the experiment was actually conducted "for the purpose of taking measurements of a person approximately the same size as Mr. Cancelleri to determine the geometry of the interior of the vehicle to assist in determining the kinematics and biomechanics of an occupant." Defs.' Brief in Supp. of Def.'s Resp., p.5, 07/03/14. Ford now makes the same argument, namely that "[n]either surrogate study was performed to replicate exactly what happened in this crash ...." Def.'s Post-Trial Motion, ¶ 26. However, Marth's own words are squarely at odds with Ford's contention, as she herself, in notably the only sentence to mention "kinematics" under the heading "Surrogate Work" in her report, writes that "the surrogate was asked to flex his head and neck forward toward the steering wheel to *simulate* occupant kinematics *in the subject accident.*" Marth Report, p.17 (emphasis added). Based on this representation and common usage of the word "simulate," as well as the aforementioned lengths to which Marth attempted to match the circumstances of her work with the circumstances of Cancelleri's accident, we readily conclude that Marth's experiment was performed with an eye toward replicating at least some of the circumstances of Cancelleri's accident.

49



Marth Report, p.15, Figure 11.



*Id.* at p.16, Figure 12.



*Id.* at Figure 13.



*Id.* at Figure 14.



*Id.* at p.17, Figure 15.



*Id.* at Figure 16.

Consequently, in order for this type of evidence to be admissible, its conditions "must be sufficiently close to those involved in the accident at issue to make the probative value of the demonstration outweigh the prejudicial effects." *Harsh*, 840 A.2d at 421 (citing *Leonard*, 557 A.2d at 745). Here, the conditions of Marth's experiment were not sufficiently close to those of Cancelleri's accident for two primary reasons. First, the "exemplar vehicle" used in her experiment is unidentified, thus requiring us, and potentially the jury, to guess as to how similar or dissimilar the vehicle is to Cancelleri's Sable. We declined to do so, and should not be expected to do so. Second, the experiment was performed in a static rather than dynamic environment. Dr. Marth concedes that the motion in her study was "limited due to the static environment," and that "in a dynamic setting there would be additional forward occupant excursion." Marth Report, p.17. As such, evidence of Marth's study was properly precluded under *Harsh*.

Additionally, because the Marth study attempted to simulate the circumstances of Cancelleri's accident rather than demonstrate general scientific principles, we likewise found that the probative value of such evidence was outweighed by the danger of confusing the issues and misleading the jury. As such, evidence of Marth's study was also inadmissible under Pennsylvania Rule of Evidence 403.

b. The Pearson Study

The second surrogate study that Ford planned to introduce was performed by Jeffrey Pearson. Like Dr. Marth's experiment, Pearson used a surrogate with "the stature and weight of Mr. Cancelleri" along with a 2004 Ford Taurus station wagon, which he writes "is manufactured on the same platform as the Mercury Sable," Defs.' Expert Report by Jeffrey L. Pearson (hereinafter "Pearson Report"), p.18, 10/09/13, to experiment as follows:

1. "The Taurus driver's leather bucket seat was electrically adjusted similar to that of Mr. Cancelleri's." *Id.*

51

2. With the seat in this position, "seat belt length measurements were made." Pearson Report, p.18.

3. "The surrogate indicated that this was not the most comfortable position for him personally." *Id.*

4. "To investigate a range of seat positions which an occupant of this stature and weight might choose[,] we adjusted the seat position to approximate the position represented in the photographs provided in [Cancelleri's] expert report." *Id.*

5. When conducting measurements approximated to those during Cancelleri's accident, "the surrogate was not able to contact the steering wheel rim with the top of his head. However, under dynamic impact conditions, and with body tissue compression not achievable with a volunteer subject, it is possible that Mr. Cancelleri's head may have reached the steering wheel rim, however, he would not have been able to strike the windshield." *Id.* at 18-19.

Just as it did with Marth's study, Ford argued that Pearson's surrogate work was "in no way conducted to replicate or recreate the subject accident," and that the experiment was actually conducted "for the purpose of taking seat belt measurements to analyze different seat and restraint positions." Defs.' Brief in Supp., p.5. However, experiments involving seat belt measurements do not appear to exemplify the kinds of "[e]xperiments showing general properties of materials" that our Superior Court had in mind with regard to admissible demonstrative evidence that is not substantially similar to the circumstances of the given event in question. *See Leonard by Meyers*, 557 A.2d at 747 n.6 (referencing an experiment involving "general physics universal in its application") (citation omitted).[19]

As such, in order for this type of evidence to be admissible, its conditions "must be sufficiently close to those involved in the accident at issue to make the probative value of the demonstration outweigh the prejudicial effects." *Harsh*, 840 A.2d at 421 (citing *Leonard*, 557 A.2d at

---

[19] Actually, in *Leonard by Meyers*, one of the only Pennsylvania cases to comment on this issue, the Superior Court referenced an experiment involving "general principles of physics universal in its application" when it noted that "a test undertaken to obtain greater scientific knowledge of general principles ... as opposed to an experiment commissioned for a specific law suit ... has the added advantage of being untrained by an interest in the litigation." 557 A.2d at 747 n.6 (citing *McCormick on Evidence* § 202, 603 n.25, 26 (3d ed. 1984)).

745). Here, the conditions of Pearson's experiment are not sufficiently close to those of Cancelleri's accident for two primary reasons. First, the vehicle used in his experiment was a 2004 Ford Taurus station wagon rather than a 2005 Mercury Sable; and second, the experiment was performed in a static rather than dynamic environment. As such, evidence of Pearson's study was inadmissible under *Harsh. Id.* We do not doubt Ford's assertions that "surrogate studies with exemplar products are routinely performed and relied on by experts in products liability cases" and that "state and federal courts in Pennsylvania have found such studies to be reliable bases for experts' opinions." Def.'s Post-Trial Motion, ¶ 132. However, we are neither bound nor compelled by the authorities on which Ford relies to conclude that Ford's surrogate studies should have been admitted in this case.[20]

Moreover, and quite significantly, because the Pearson study attempted to purport that seat belt measurements are somehow a form of general scientific principles, we likewise found that the probative value of such evidence was outweighed by the danger of confusing the issues and misleading the jury. As such, evidence of Pearson's study was also inadmissible under Pennsylvania Rule of Evidence 403.

### E. We properly precluded application of the Restatement (Third) of Torts along with evidence of industry standards.

In its first Post-Trial Motion, Ford alleges that we "erred by refusing to admit evidence of industry standards, under either the Restatement (Third) of Torts: Products Liability § 2 or the

---

[20] Ford cites three federal rulings. In the first, *Elick v. Ford Motor Co.*, the plaintiff's expert "performed a series of quasistatic inversion tests on a 1994 Ford Explorer exemplar vehicle and on the same model equipped with two proposed alternative designs," and then proceeded to add "five pounds of tension to the seatbelt in order to simulate the activation of the rollover pretensioner in this alternative restraint system." No. 08-1700, 2010 WL 2505917, at *1 (W.D.Pa. June 21, 2010). In the second, *Pa. Trust Co. v. Dorel Juvenile Grp., Inc.*, the court, without describing the study performed, merely concluded that Ford's expert's method "included a review of the case files, inspection of an exemplar vehicle and seat with a surrogate subject, and accident reconstruction performed by a licensed professional engineer, and a biomechanical analysis of the collision forces at work in the minivan's passenger cabin at the time of impact." 851 F.Supp.2d 831, 839 (E.D.Pa. 2011) (citation omitted). In the third, *Burke v. Transam Trucking, Inc.*, the plaintiff's expert used the vehicle parameters and measurements of the plaintiff's vehicle, a 2000 Ford Ranger, to perform laboratory compression testing and a vehicle dynamics analysis. 617 F.Supp.2d 327, 329-330 (M.D.Pa. 2009). The expert also "utilized the Armstrong Laboratory/Weight-Patterson Air Force Base (AL/WPAFB) computer program to analyze this data; determined the geometric and mass properties of Plaintiff's body segments and joint locations and range of motion characteristics using the Generator of Body Data (GEBOD) AL/WFAFB computer program and performed dynamic analysis for the collision using this program." *Id.*

Restatement (Second) of Torts § 402A in a crashworthiness case, prejudicing Ford." Def.'s Post-Trial Motion, ¶ 144. In its Post-Argument Notice of Supplemental Authority, Ford contends that our Supreme Court's overruling of *Azzarello v. Black Brothers Co.*, 391 A.2d 1020 (Pa. 1978), in *Tincher v. Omega Flex*, — A.3d —, No. 17 MAP 2013, 2014 WL 6474923 (Pa. Nov. 19 2014), is confirmation that "it was error to exclude evidence of industry standards and customs ...." Def.'s Post-Argument Notice of Supp. Auth., p.1, Nov. 24, 2014. We disagree based on the plain language of *Tincher*, where our Supreme Court held, *inter alia*,

> To the extent relevant here, we decline to adopt the Restatement (Third) of Torts: Products Liability §§ 1 *et seq.*, albeit appreciation of certain principles contained in that Restatement has certainly informed our consideration of the proper approach to strict liability in Pennsylvania in the post-*Azzarello* paradigm.

2014 WL 6474923, at *1. As to the "extent relevant" in *Tincher*, the Court wisely noted,

> Omega Flex notes that this approach [under *Azzarello*] has the collateral effect of rendering laws, regulations, and industry standards irrelevant to the risk-utility inquiry, with deleterious and unpredictable consequences for plaintiffs and defendants. Omega Flex does not develop this assertion and, as a result, *we do not address it in any detail.*

*Id.* at 11 n.4 (emphasis added). Consequently, it was and remains proper in Pennsylvania to apply the Restatement (Second) of Torts § 402A to evidentiary issues related to industry standards.

## 1. Industry Standards Evidence Standard

Our appellate courts have made clear that "the question of whether or not the defendant has complied with industry standards improperly focuses on the quality of the defendant's conduct in making its design choice, and not on the attributes of the product itself." *Gaudio*, 976 A.2d at 543 (quoting *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 528 A.2d 590, 594 (Pa. 1987) (citation omitted)). Specifically, our Supreme Court has "held that 'such evidence should be excluded because it tends to mislead the jury's attention from their proper inquiry,' namely 'the quality or design of the product in question.'" *Id.* (quoting *Lewis*, 528 A.2d at 594) (citations omitted)). Moreover, the Court "also indicated that 'there is no relevance in the fact that such a design is widespread in the

54

industry.'" *Gaudio*, 976 A.2d at 543 (quoting *Lewis*, 528 A.2d at 594). This rationale to exclude evidence of compliance with industry standards has also extended "to exclude evidence of compliance with government standards." *Id.* (citing, *e.g.*, *Harsh* 840 A.2d at 425) (evidence of compliance with the Federal Motor Vehicle Safety standards is inadmissible in products liability actions).

This is not to say, however, that all evidence of compliance with industry or government standards by a defendant is inadmissible as not relevant. We acknowledge that "a plaintiff may 'open the door' to the introduction of evidence of compliance with industry or government standards by a defendant if a plaintiff's witness testified about industry or government standards during either direct or cross-examination." *Id.* at 544. "In this regard, however, the openings so created should be reasonably related in scope to the substance of the offending testimony." *Id.* Overall, "a defendant's opportunity to introduce evidence of compliance with industry or government standards is limited to testimony necessary to respond to the evidence presented (i.e., to deny or rebut it)." *Id.*

Here, just as it did before trial, Ford argues that evidence of industry or government standards, state of the art concepts, industry customs, and its own reasonableness in design or manufacture of the 2005 Mercury Sable should have been permitted "because this is a crashworthiness case where issues of foreseeability, reasonableness, and [Ford's] knowledge of unintended but foreseeable uses would be at issue." Def.s' Post-Trial Motion, ¶ 141. In precluding this evidence before trial, we reasoned that because such an exception to the general exclusion of evidence of compliance with industry and government standards had yet to be decreed, Ford's argument necessarily failed, and it may only have used such evidence to deny or rebut testimony presented by Cancelleris' witnesses. Since none of Cancelleris' witnesses presented any rebuttable testimony substantially related to these issues, there was no need to revisit these issues during trial. As a result, there is no present need to revisit our ruling.

*F. We properly precluded evidence concerning tests by NHTSA and the IIHS.*

In the last issue of its Post-Trial Motion, Ford contends that "the Court erred in excluding evidence concerning tests by NHTSA[21] and the IIHS[22] during Mr. Caruso's cross-examination." Def.'s Post-Trial Motion, Part G. In particular, Ford contends that a number of Offset Deformable Barrier tests performed by the NHTSA and the IIHS "were relevant to impeach Mr. Caruso's credibility concerning the alleged causal connection between the crash and displacement of fiberglass as it relates to the performance of the FCS." Def.'s Post-Trial Motion, ¶ 150 (citation omitted).

Here, we readily acknowledge that "where the evidence proposed goes to the impeachment of his opponent's witness, it is admissible as a matter of right." *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 709 (Pa. Super. 2000) (quoting *Feingold v. Southeastern Pa. Transp. Auth.*, 517 A.2d 1270, 1274 (Pa. 1986)). The problem for Ford, however, was that Caruso could not be impeached with evidence of industry standards previously precluded by this Court nor on tests that were not elicited on direct examination. Ford concedes the latter, writing that "Caruso did not mention the above tests during his direct examination ...." Def.'s Post-Trial Motion, ¶ 149 (citation omitted). Moreover, this is not an issue related to "prior claims testimony." *See Spino v. John S. Tilley Ladder Co.*, 969 A.2d 1169, 1173 (Pa. 1997) (Evidence of the non-existence of prior claims is admissible in a products liability case if: (1) the evidence is relevant to the issue of causation; and (2) the offering party has provided a proper foundation, namely that "they would have known about the prior,

---

[21] The National Highway Traffic Safety Administration, or NHTSA, is an agency of the United States Department of Transportation, and "was established by the Highway Safety Act of 1970 and is dedicated to achieving the highest standards of excellence in motor vehicle and highway safety." About NHTSA, *Nat'l Highway Traffic Safety Admin.*, http://www.nhtsa.gov/About (last visited Dec. 9, 2014). Moreover, "[i]t works daily to help prevent crashes and their attendant costs, both human and financial. *Id.*

[22] The Insurance Institute for Highway Safety, or IIHS, "is an independent, nonprofit scientific and educational organization dedicated to reducing the losses–deaths, injuries, and property damage–from crashed on the nation's roads." *About the Institutes, Ins. Inst. for Highway Safety,* http://www.iihs.org/iihs/about-us (last visited Dec. 9, 2014). Moreover, "IIHS was founded in 1959 by three major insurance associations representing 80 percent of the U.S. auto insurance market." *Id.*

56

substantially similar accidents involving the product at issue."); *Parr*, 2014 WL 7342153, at *12 (The proponent of the evidence bears the burden "to establish, to the court's satisfaction, the similarity between other accidents and the subject accident before this evidence could have been admitted for any purpose." (citing *Hutchinson*, 876 A.2d 978)). Therefore, evidence concerning tests by the NHTSA and the IIHS was properly precluded for all of the same reasons set forth in *supra* Part IV(E). *See also Gaudio*, 976 A.2d at 547 (In precluding the NHTSA's safety ratings for the 1994 to 1996 Ford F-150, our Superior Court wrote that "manufacturers may not attempt to prove the quality or design of their product by showing that it comports with industry or government standards or is in widespread industry use." (citation omitted)).

### G. The jury was properly instructed with regard to the standard of proof in a strict liability action.

Finally, in its Post-Argument Notice of Supplemental Authority, Ford argues that because "*Tincher* specifically rejected the *Azzarello* jury instruction," the language used in this Court's jury instructions "amounted to a 'fundamental error'" and "a 'new trial [is] appropriate.'" Def.'s Post-Argument Notice of Supp. Auth., p.2, 11/24/14 (citing *Tincher*, 2014 WL 6474923, at *72). This "fundamental error" goes unexplained in Ford's Post-Argument Notice, though Ford appears to contend, quite incredibly, that usage of the phrases "guarantor" and "every element" in jury instructions for strict liability cases automatically amounts to a fundamental error necessitating a new trial. Said Ford, in a patchwork of *Tincher* parentheticals,

> *Tincher* overruled *Azzarello* in all relevant respects. *Tincher* specifically rejected the *Azzarello* jury instruction. *See Tincher* 2014 WL 6474923, at *42 ("guarantor" language is "impractical" and "failed to explain" "terms of art"); *29 ("every element" language was taken "out of context by the majority in *Azzarello* as the standard of proof in a strict liability action"); *40 (instruction as a whole "perpetuated jury confusion … rather than dissipating it"). Because the Court's instructions amounted to a "fundamental error," a "new trial [is] appropriate." *Id.* at *72 (citing *Price v. Guy*, 735 A.2d 668, 672 (Pa. 1999) (footnote citation omitted).

Def.'s Post-Argument Notice of Supp. Auth., p.2. Ford's request for a new trial on these grounds is, as the Cancelleris aptly put, a request "to go where the *Tincher* Court never did—to make a quantum leap to find prejudicial error from the mere inclusion of the 'guarantor' and 'every element' language in a jury charge." Pls.' Resp. to Supp. Auth., p.2, 12/15/14.

Significantly, Ford omits *Tincher's* decree that, despite overruling *Azzarello* and supposedly rejecting all jury instructions borne out of it, "Whether Omega Flex is entitled to additional relief, including a new trial or judgment notwithstanding the verdict is not apparent upon the record before us." *Tincher*, 2014 WL 6474923, at *72. Without any further argument regarding a "fundamental error" on this point, we cannot find that Ford was prejudiced by our instructions as a whole. The jury was properly instructed on the definition of "design defect" based on the principles set forth in *Gaudio* and the current Pennsylvania Standard Civil Jury Instructions. In *Gaudio*, the trial court instructed,

> The supplier of a product is liable for the injuries caused to a Plaintiff by a defect in the article which existed when the product left the possession of the supplier. Such liability is imposed even if the supplier has taken all possible care in the preparation and sale of the product. The manufacturer of a product is a guarantor of its safety. ... If you find that the product at the time it left [Ford's] control lacked any element necessary to make it safe for its intended use or contained any condition that made it unsafe for its intended use and there was an alternative safer design then the product was defective. [Ford] is liable for all harm caused by the defect.

976 A.2d at 550 (citing Trial Notes of Testimony, 15-16, June 16, 2006). Similarly, our Standard Civil Jury Instructions provide,

> 16.20 (Civ) DEFINITION OF DESIGN "DEFECT"
> The *[specify type of supplier, e.g., manufacturer, distributor, wholesaler, etc.]* of a product is a guarantor of its safety. The product must be provided with every element necessary to make it safe for [its intended] use, and without any condition that makes it unsafe for [its intended] use. If you find that the product, at the time it left the defendant's control, lacked any element necessary to make it safe for [its intended] use, or contained any condition that made it unsafe for [its intended] use, [and there was an alternative, safer practicable design,] then the product was defective and the defendant is liable for all harm caused by the defect.

58

Pa. SSJI (Civ), § 16.20 (2013). Based on these standards, we instructed the jury as follows:

> Now, I am using the term design defect. Ford, as the manufacturer of the airbag restraint system of the 2005 Mercury Sable is the guarantor of the system's safety. The system must be provided with every element necessary to make it safe for its intended use and without any condition that makes it unsafe for its intended use. A manufacturer like Ford must include accidents as intended uses and design accordingly.
>
> If you find that the airbag restraint system of the 2005 Mercury Sable at the time it left Ford's control lacked any element necessary to make it safe for its intended use or contained any conditions that made it unsafe for its intended use and that there was an alternative safer practical design that would have prevented Mr. Cancelleri's injuries, then the system was defective, and Ford is liable for the harm that produced the injuries above and beyond those that were probably caused by the Sable's original collision, if you find that injuries would have been caused in the original collision had the airbag deployed.

N.T., 94-95:2-1, 08/21/14 (Nardozzi). Review of this instruction as a whole yields an extrapolation

of the principles clearly expressed by our Supreme Court in *Tincher*, namely that,

> Strict liability in tort for product defects is a cause of action which implicates the social and economic policy of this Commonwealth. ... [T]hose who sell a product (*i.e.*, profit from making and putting a product in the stream of commerce) are held responsible for damage caused to a consumer by the reasonable use of the product. The risk of injury is placed, therefore, upon the supplier of products.
>
> ...
>
> Stated affirmatively, a person or entity engaged in the business of selling a product has a duty to make and/or market the product—which "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold"—free from "a defective condition unreasonably dangerous to the consumer or [the consumer's] property." *Accord* RESTATEMENT (2D) OF TORTS § 402A(1).

*Tincher*, 2014 WL 6574923, at *45-46 (internal citations omitted) (emphasis added). Finding that

these instructions comport with the current state of the law, and that any error in using the phrases

"guarantor" and "every element" could not possibly amount to prejudice against Ford requiring a

new trial, Ford's Post-Argument Notice of Supplemental Authority is similarly unpersuasive.

## V. Conclusion

In short, Ford asks us inventively to enter a JNOV in its favor or award it a new trial based predominantly on malfunction issues that the jury was ultimately not asked to decide and concepts of the Third Restatement. Because we decided the former in compliance with the law and because adoption of the latter was expressly rejected by our Supreme Court, Ford's Post-Trial Motion is denied in its entirety.

| | |
|---|---|
| JOHN A. CANCELLERI and ROSETTA CANCELLERI, His Wife,<br><br>    Plaintiffs<br><br><br>v.<br><br>FORD MOTOR COMPANY and RAY PRICE MOTORS, INC.,<br><br>    Defendants | In the Court of Common Pleas of Lackawanna County<br><br><br><br>Civil Division<br><br><br><br><br>No. 2011-CIV-6060 |

## ORDER DENYING DEFENDANT FORD'S POST-TRIAL MOTION

AND NOW, this 9th day of January, 2015, upon consideration of the Defendant's motion, the Plaintiffs' response thereto, briefs and supplemental authority submitted by both parties, and oral argument, it is hereby ORDERED that the Motion for Post-Trial Relief filed by Defendant Ford Motor Company in the above-captioned matter on September 2, 2014 is DENIED.

BY THE COURT

_____, J.

James A. Gibbons

61



| | | |
|---|---|---|
| JOHN A. CANCELLERI and<br>ROSETTA CANCELLERI, His Wife,<br><br>Plaintiffs<br><br>v.<br><br>FORD MOTOR COMPANY and<br>RAY PRICE MOTORS, INC.,<br><br>Defendants | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | In the Court of Common Pleas<br>of Lackawanna County<br><br><br><br>Civil Division<br><br><br><br><br>No. 2011-CIV-6060 |

## PA.R.A.P. 1925(a) OPINION

On January 9, 2015, we denied Defendant Ford Motor Company's Post-Trial Motion requesting a JNOV and, alternatively, a new trial. That Motion concerned a litany of claimed errors arising from a products liability case that ended on August 21, 2014 with a jury verdict against Ford and in favor of Plaintiffs John and Rosetta Cancelleri in the amount of $5,940,705.86. That same day, we granted the Cancelleris' Motion for Delay Damages and molded the award to $6,291,796.99. We also referred the Cancelleris' Motion for Taxable Costs to the Lackawanna County Court of Judicial Records for her consideration in accordance with Lacka. Co. R.C.P. 275.

Having received Ford's Notice of Appeal on February 5, 2015 and its Concise Statement of Matters Complained of on Appeal on February 26, 2015, we write now pursuant to Pa.R.A.P. 1925(a). Because the reasons for the Order that Ford now appeals are set forth in our Memorandum and Order Denying Defendant Ford's Post-Trial Motion entered on January 9, 2015, we will not revisit the issues here.

BY THE COURT

March 2, 2015

_____, J.

James A. Gibbons

cc:   *Written notice of the entry of the foregoing Order has been provided to each party pursuant to Pa.R.C.P. 236(a) and (d) by e-mailing time-stamped copies to:*

For Plaintiffs:   Bruce S. Zero, Esq., bzero@powell-law.com
James F. Mundy, Esq., jfmundy52@gmail.com

Powell Law
527 Linden Street
Scranton, PA 18503

For Defendants:   William J. Conroy, Esq., wconroy@campbell-trial-lawyers.com
Tiffany M. Alexander, Esq., talexander@campbell-trial-lawyers.com
Emily J. Rogers, Esq., erogers@campbell-trial-lawyers.com
Katherine A. Wang, Esq., kwang@campbell-trial-lawyers.com

Campbell Campbell Edwards & Conroy, P.C.
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312

Superior Court of
Pennsylvania:   601 Commonwealth Avenue, Harrisburg, PA 17120